UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ANDREW LONGUSKI,
      Plaintiff,

                                CASE NO.: 2:19-cv-190
                                HON.: Paul L. Maloney
                                Magistrate Maarten Vermaat

v.

RYAN AKERS in his individual capacity, and
GARY DEMERS in his individual capacity.
      Defendants.

---

JULIE A. GAFKAY (P53680)
GAFKAY LAW, PLC
**Attorney for Plaintiff**
175 S. Main Street
Frankenmuth, MI 48734
(989) 652-9240
jgafkay@gafkaylaw.com


JOHN G. FEDYNSKY (P65232)
JOSEPH T. FROEHLICH (P71887)
MICHIGAN DEPARTMENT OF
ATTORNEY GENERAL
**Attorneys for Defendant Akers**
**State Operations Division**
P.O. Box 30754
Lansing, MI 48909
(517) 335-7573
fedynskyj@michigan.gov
froehlichj1@michigan.gov

JAMES T. FARRELL (P35400)
MICHIGAN DEPARTMENT OF
ATTORNEY GENERAL
**Attorney for Defendant Demers**
**MDOC Division**
P.O. Box 30217
Lansing, MI 48909
(517) 335-3055
farrellj@michigan.gov

---

**EXHIBIT 2**
**INTERNAL AFFAIRS REPORT**

# J. STUART SPENCER
## Mackinac County Prosecuting Attorney

Courtney Aldrich
*Victim Rights Specialist*

Denise Smith
*Criminal Registrar*

**Zackary Sylvain**
*Assistant Prosecuting Attorney*

---

September 10, 2018

Scott Grabel
Attorney for the Defense
149 E. Main Avenue
Zeeland, MI 49464

RE:    The People of the State of Michigan v. Andrew Paul Longuski, Case No. 18-136-SM

Dear Mr. Grabel:

The 92nd District Court has requested a redacted copy of the Internal Affairs Report as it pertains to your client, Mr. Longuski. As such, copies are also being provided to the attorneys in this case. If you have any questions, please do not hesitate to contact this office at your earliest convenience.

Sincerely,

Denise Smith
Criminal Registrar

Enc.

**STATE OF MICHIGAN**
**92ⁿᵈ DISTRICT COURT OF MACKINAC COUNTY**

PEOPLE OF THE STATE OF MICHIGAN,
      Plaintiff

CASE NO.  18-136-SM

v.

HON. BETH A. GIBSON

ANDREW PAUL LONGUSKI,
      Defendant

| J. STUART SPENCER (P45315) | SCOTT GRABEL (P53310) |
|---|---|
| Mackinac County Prosecutor | Attorney for the Defense |
| 100 S. Marley Street | 149 E. Main Avenue |
| Saint Ignace, MI 49781 | Zeeland, MI 49464 |
| (906) 643-7329 | (616) 931-7030 |

**PROOF OF SERVICE**

The undersigned certifies that on September 10, 2018 she served a redacted copy of the Internal Affairs Report via prepaid United States Postal Service, in regard to the above captioned matter to the attorney on record:

Denise L. Smith

Dated:  September 10, 2018

| Internal Affairs | ORIGINAL DATE | | INCIDENT NO. |
|---|---|---|---|
| ORIGINAL INCIDENT | WED, July 11, 2018 | | IA-133-18 |
| REPORT | TIME RECEIVED | | FILE CLASS |
| | | | 99009 |

| | WORK UNIT | | COUNTY |
|---|---|---|---|
| | MSP EXEC DIV IA AICS | | Ingham |
| COMPLAINANT | | | TELEPHONE NO. |
| MICHIGAN STATE POLICE | | | 517-284-3278 |
| ADDRESS: STREET AND NO. | | CITY | STATE | ZIP CODE |
| 7150 HARRIS DRIVE | | DIMONDALE | MI | 48821 |
| INCIDENT STATUS | | | | |
| Closed | | | | |

# ALLEGED MISCONDUCT

**SUMMARY:**

On July 11, 2018, the Professional Standards Section received a BlueTeam Administrative Complaint Report (BTACR) that alleged Tpr. Ryan Akers intentionally falsified and omitted material facts from eAICS Original Incident Report No. 83-600-18. It was further alleged that Trooper Akers shirked his duties and responsibilities when he failed to complete a thorough investigation and failed to obtain all available evidence regarding the incident documented in eAICS Incident Report No. 83-600-18. It was also alleged that Trooper Akers was unprofessional toward D/F/Lt. Andrew Longuski and D/Sgt. Derrick Jordan when he made contact with them at Horn's Gaslight Bar and Restaurant on May 18, 2018.

On May 18, 2018, Trooper Akers, while assigned to the Mackinac Island Detail, made contact with two male subjects riding tandem on a bicycle with only one seat. Trooper Akers issued the two male subjects a verbal warning for riding tandem and cleared. A short time later, it was discovered that the bicycle the two subjects were riding on was a stolen bicycle. A criminal investigation ensued and Trooper Akers, along with Mackinaw Island Police Department (MIPD) Ofcrs. Cory Kaminen and Kurtis Morin, re-contacted the two male subjects at Horn's Gaslight Bar and Restaurant. The two male subjects were identified as D/F/Lieutenant Longuski and D/Sergeant Jordan. No enforcement action was taken on May 18, 2018. Trooper Akers submitted his report, eAICS Original Incident Report No. 83-600-18, to the Mackinac County Prosecutor's Office. The prosecutor's office issued criminal charges against D/F/Lieutenant Longuski and D/Sergeant Jordan for Larceny under two hundred dollars and disorderly conduct-disturbing the peace. D/F/Lieutenant Longuski and D/Sergeant Jordan were subsequently arrested on the charges and the criminal case against each of them was still pending adjudication. The internal investigation regarding D/F/Lieutenant Longuski's and D/Sergeant Jordan's actions was assigned to Spl/Lt. Christopher Croley and was documented in complaint number, IA-095-18. On July 11, 2018, D/F/Lieutenant Longuski submitted a BlueTeam Administrative Complaint Report against Trooper Akers with the above listed allegations.

During a review of the BTACR it was learned that D/F/Lieutenant Longuski alleged, more specifically, that Trooper Akers failed to retrieve video from Horn's Gaslight Bar and Restaurant when he contacted them after he learned the bike was stolen, that the video was vital to the disorderly conduct charge, that the video was omitted by Trooper Akers due to his aggressive behavior, even though he knew that video existed, that Trooper Akers disregarded statements made by D/Sergeant Jordan that D/F/Lieutenant Longuski was not with him and knew nothing about the bike, that Trooper Akers placed certain facts in the report that were used to obtain charges, and were not supported by the video Trooper Akers chose to include in the report. Trooper Akers failed to correct the discrepancies prior to arraignment. Trooper Akers reported that he observed D/Sergeant Jordan get on the bike at the curb at the Pink Pony Bar and then D/F/Lieutenant Longuski got on

| PAGE | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
|---|---|---|---|
| 1 of 41 | SPL/L.T. RICK SEKELY | SPL/L.T. RICK SEKELY | JAN |

| Internal Affairs | ORIGINAL DATE | INCIDENT NO. |
| | WED, July 11, 2018 | IA-133-18 |
| ORIGINAL INCIDENT | TIME RECEIVED | FILE CLASS |
| REPORT | | 99009 |

behind him. Video showed D/Sergeant Jordan got on the bike by himself, rode down the road to the rest of the crowd where D/F/Lieutenant Longuski stopped him and got on the bike. Trooper Akers wrote that he believed the bike was stolen twice, but the video showed D/Sergeant Jordan rode the bike up to the Pink Pony Bar alone. Trooper Akers wrote that when D/F/Lieutenant Longuski and D/Sergeant Jordan stopped on the bike, both jumped from the bike and let it fall to the ground. The video showed that they dismounted without any signs of intoxication, D/Sergeant Jordan put the kickstand down, but the bike rolled forward and fell to the ground, which was immediately picked up by D/Sergeant Jordan. Trooper Akers wrote that D/Sergeant Jordan did not return the bike when asked. The video and audio showed that D/Sergeant Jordan walked the bike to return it when one of the MIPD officers stated the owners were already there to get the bike. D/Sergeant Jordan asked Trooper Akers if they were good, they shook hands, and D/Sergeant Jordan departed. Additionally, it was alleged in the BTACR that Trooper Akers did not conduct a proper investigation, that he was only accusatory and never asked basic investigative questions that would have led to a better conclusion. Further, it was alleged in the BTACR that Trooper Akers was unprofessional when he contacted D/F/Lieutenant Longuski and D/Sergeant Jordan in front of Horn's Gaslight Bar and Restaurant when he struck the window to get their attention, and subsequently called them out as cops and humiliated them in front of citizens and other patrons of the bar.

A review of the eAICS Incident Report No. 83-600-18 revealed the following information related to the allegations. In the Original Incident Report (written by Trooper Akers), there was no indication that video surveillance footage (VSF) sources had been identified and/or had been viewed or obtained, or that any attempts were made to try and identify potential VSF sources and obtain VSF related to the investigation. Trooper Akers did note that the body worn camera footage from MIPD officers would be added at a future date. Supplemental Incident Report No. 001(written by D/Sergeant Demers) indicated the body worn camera footage from the MIPD and other VSF from various businesses had been obtained on May 22, 2018, but only contained a vague description of what each video depicted. There was no indication in the Original Incident Report that D/Sergeant Jordan told Trooper Akers that D/F/Lieutenant Longuski had nothing to do with the bike. The Original Incident Report indicated that potential witnesses (members of the group that D/F/Lieutenant Longuski and D/Sergeant Jordan were with), were not identified and interviewed. The Original Incident Report indicated that when Trooper Akers contacted D/F/Lieutenant Longuski and D/Sergeant Jordan, he asked them if they were "cops" and then accused them of stealing the bike. Trooper Akers wrote several times that D/F/Lieutenant Longuski and D/Sergeant Jordan were intoxicated, but did not document any specific observations that lead him to that conclusion. The Original Incident Report contained the following statements that were contradictory to what was observed on VSF that was eventually obtained. "D/Sgt. Jordan got on a bike that was parked at the curb, and D/F/Lt. Longuski got on behind him.", and, "Both jumped off, letting the bike fall to the road." Trooper Akers wrote that during the interview with D/Sergeant Jordan, he suggested to him that they return the bike and D/Sergeant Jordan agreed and then "Walked off with the rest of his group and left me with the bike, apparently not meaning what he said about going and apologizing." Trooper Akers wrote that he believed an unknown person stole the bike from The Inn on Mackinac and the rode it to the Pink Pony Bar and then later, D/F/Lieutenant Longuski and D/Sergeant Jordan came out of the Pink Pony Bar and took the bike for their own use, "Stealing it a second time."

A review of MIPD Incident Report No. 18-000034 revealed no new information that had not previously been learned.

| PAGE | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
| 2 of 41 | SPL/LT. RICK SEKELY | SPL/LT. RICK SEKELY | JAN |

Internal Affairs
ORIGINAL INCIDENT
REPORT

| ORIGINAL DATE | INCIDENT NO. |
|---|---|
| WED, July 11, 2018 | IA-133-18 |
| TIME RECEIVED | FILE CLASS |
| | 99009 |

During contact with D/Sgt. Gary Demers, it was revealed that he reviewed the Original Incident Report on May 21, 2018, and hand delivered it to the prosecutor on that same date. When he submitted the report, he only submitted eAICS Original Incident Report No. 83-600-18. He did not submit any external documents or video (information had not been obtained at that point). On May 22, 2018, after criminal charges had been authorized on D/F/Lieutenant Longuski and D/Sergeant Jordan, the videos were delivered to him by Tpr. Shelley Izzard. He completed Supplemental Incident Report No. 001, viewed the videos, and summarized them in the supplemental report. He was not certain when the supplemental report and videos were submitted to the prosecutor.

During the witness interview, D/Sgt. Nathan Horan said he and his wife left the hotel and walked with D/Sergeant Jordan and Det. Mike Babycz, headed toward the Pink Pony Bar. At some point while they were walking, D/Sergeant Jordan split off from them. A short time later, D/Sergeant Jordan approached them on a bike, rode a circle around them, and continued further down the street. He said as they approached the Pink Pony Bar, D/Sergeant Jordan approached them again on the bike and then parked it at the curb and they all entered the Pink Pony Bar. He said they were planning to meet up with D/F/Lieutenant Longuski, D/Sergeant Heliin, and some other people at the Pink Pony Bar. He did not have any conversation with D/Sergeant Jordan about the bike. D/Sergeant Horan said when they arrived at the Pink Pony Bar, they talked to D/F/Lieutenant Longuski and the group he was with and it was decided they were all going to go to Horn's Gaslight Bar and Restaurant. D/Sergeant Horan believed he and his wife used the restroom at the Pink Pony Bar. When he exited the Pink Pony Bar, he observed D/F/Lieutenant Longuski and D/Sergeant Jordan getting pulled over by police officers. When he arrived at Horn's Gaslight Bar and Restaurant, the police contact was over, and the entire group of people went into Horn's Gaslight Bar and Restaurant, got a table and ordered some drinks. He was on the dance floor with his wife and he observed a police officer come in and motion for D/F/Lieutenant Longuski and D/Sergeant Jordan to go outside. He continued to watch from the dance floor

| PAGE | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
|---|---|---|---|
| 3 of 41 | SPL/LT. RICK SEKELY | SPL/LT. RICK SEKELY | JAN |

| Internal Affairs ORIGINAL INCIDENT REPORT | ORIGINAL DATE WED, July 11, 2018 | INCIDENT NO. IA-133-18 |
|---|---|---|
| | TIME RECEIVED | FILE CLASS 99009 |

and observed one of the police officers "kind of puffed up and in Andy's face, just pointing his finger at him." D/Sergeant Horan wondered what was going on and some of the other members of their group started going outside. D/Sergeant Horan said he moved closer to their table, which was next to the front window, to get a closer look and that was when the police officers and members from their group walked down the street and out of view. He and his wife remained at the bar. A while later they came back and when he asked D/F/Lieutenant Longuski what happened, he was told that the officers were accusing him of stealing a bike. D/Sergeant Horan did not hear any of the initial conversation between the officers and D/F/Lieutenant Longuski and D/Sergeant Jordan. He did not personally speak with any of the police officers, and none of the police officers approached him and asked him questions, or for his name and contact information.

During the witness interview, Det. Gary Gaudard said he attended the dinner at the hotel and then himself, D/F/Lieutenant Longuski, D/Sgt. Mike DeNoon, and Ms. Misty DeNoon took a carriage ride to the Pink Pony Bar. He said the four of them were at the Pink Pony Bar for approximately an hour and were getting ready to leave when D/Sergeant Jordan arrived. Within a few minutes of D/Sergeant Jordan's arrival, they all walked out onto the front porch of the Pink Pony Bar. He said he and D/F/Lieutenant Longuski went to the left and began walking toward Horn's Gaslight Bar and Restaurant while D/Sergeant Jordan went to the right and a few seconds later D/Sergeant Jordan came back by them riding a bike. D/F/Lieutenant Longuski "jogged down" to D/Sergeant Jordan and got on the bike with him. He said a few seconds after D/F/Lieutenant Longuski got on the bike, two or three uniformed officers rode by and made contact with D/F/Lieutenant Longuski and D/Sergeant Jordan. Their group proceeded into Horn's Gaslight Bar and Restaurant and obtained a table next to a front window. Detective Gaudard heard banging on the window and he turned around to see a uniform trooper, attired in a fatigue style uniform. The trooper pointed and yelled through the glass window something to the effect of, "You and you, come here." D/F/Lieutenant Longuski went outside to speak with the trooper and Detective Gaudard stood at the threshold of the door with the door open. The trooper immediately accused D/F/Lieutenant Longuski of stealing a bike. Detective Gaudard described the initial contact as tense. He said the trooper's tone and accusatory comments toward D/F/Lieutenant Longuski and D/Sergeant Jordan was not how he would have addressed another member of his own agency, especially members of a higher rank than him. He said he was shocked at how the young trooper was talking to command officers. Detective Gaudard did not hear any foul language used on the part of the trooper. Detective Gaudard said when D/Sergeant Jordan came outside, the first thing he said to the trooper was something to the effect that D/F/Lieutenant Longuski had nothing to do with it and it seemed to him that the trooper did not want to hear that. Detective Gaudard said he did not hear the trooper ask D/F/Lieutenant Longuski or D/Sergeant Jordan if they were police officers. Detective Gaudard said a decision was made to move the conversation away from the front of the bar and he stayed within eyesight of them, could hear them talking, but he was not close enough to hear what was being said. Detective Gaudard did not recall seeing the trooper point his finger at either D/F/Lieutenant Longuski or D/Sergeant Jordan once outside the bar. Detective Gaudard said it seemed to him that the trooper did not want to listen to what D/F/Lieutenant Longuski and D/Sergeant Jordan were telling him, and it appeared to him that the trooper had made up his mind as to what happened. Detective Gaudard believed the trooper's contact with D/F/Lieutenant Longuski and D/Sergeant Jordan was unprofessional. Detective Gaudard said the trooper "was not in an investigative mode, he was in a full blown you did it mode." He did speak with one of the MIPD officers, but it was not an interview and no statement was taken from him. None of the police officers approached him and asked him questions, or for his name and contact information. He felt he had relevant information to provide to investigators if he had been interviewed, especially regarding D/F/Lieutenant Longuski's involvement because

| PAGE 4 of 41 | INVESTIGATED BY SPL/LT. RICK SEKELY | REPORTED BY SPL/LT. RICK SEKELY | REVIEWED BY JAN |
|---|---|---|---|

| Internal Affairs ORIGINAL INCIDENT REPORT | ORIGINAL DATE WED, July 11, 2018 | INCIDENT NO. IA-133-18 |
|---|---|---|
| | TIME RECEIVED | FILE CLASS 99009 |

he was with him the entire time, from the banquet dinner, to the carriage ride, to the Pink Pony Bar and then Horn's Gaslight Bar and Restaurant.

During the witness interview, D/Sergeant DeNoon said he and his wife attended the dinner at the hotel and then himself, his wife, Detective Gaudard, D/F/Lieutenant Longuski, and "one other person I'm not sure who that was, but it wasn't Derrick" all shared a carriage ride to the Pink Pony Bar. He believed they had been at the Pink Pony Bar at least an hour before D/Sergeant Jordan showed up. D/Sergeant DeNoon said shortly after D/Sergeant Jordan arrived they all left and went to another bar down the road. D/Sergeant DeNoon exited the Pink Pony Bar and observed D/Sergeant Jordan riding a bike, headed in the same direction as they were. He said D/F/Lieutenant Longuski yelled to D/Sergeant Jordan, "hold on a minute," and then he went over and jumped on the seat of the bike. Once their group arrived at Horn's Gaslight Bar and Restaurant, they sat at a large table in the front of the bar, next to a larger picture window. D/Sergeant DeNoon sat next to the window, with his back to the window. While at the bar, he heard a banging on the window. He turned around and observed a trooper pointing into the bar at D/F/Lieutenant Longuski and directed him outside saying something to the effect of "out here now." D/F/Lieutenant Longuski and D/Sergeant Jordan went outside to speak with the trooper. D/Sergeant DeNoon remained inside the Bar, but observed the interaction through the window. He could not hear what was being said, but it appeared to him that the trooper was "reading the riot act" to D/F/Lieutenant Longuski and D/Sergeant Jordan. The officers, D/F/Lieutenant Longuski, and D/Sergeant Jordan then walked up the hill to what he believed was the MIPD. He and Detective Gaudard followed them and once they were up at the MIPD, the trooper that had banged on the window was talking to D/F/Lieutenant Longuski and another officer was talking to D/Sergeant Jordan. He could not hear what was being said, but the trooper was being "aggressive" in the way he was talking to D/F/Lieutenant Longuski. D/Sergeant DeNoon said it seemed to him like the trooper was mad at D/F/Lieutenant Longuski about something. D/Sergeant DeNoon said the trooper's voice was raised, he was pointing his finger and his "brow was furrowed." He did not hear the trooper use any vulgar language. D/Sergeant DeNoon said none of the officers interviewed him and none of them asked him for his name and contact information. He said he did not know whether or not D/Sergeant Jordan told the trooper that D/F/Lieutenant Longuski was not involved with the bike.

During the witness interview, D/Sergeant Heliin did not recall any information from when the group left the Pink Pony Bar. When they were at Horn's Gaslight Bar and Restaurant. he did not witness the manner in which Trooper Akers made contact with D/F/Lieutenant Longuski and D/Sergeant Jordan. It was pointed out to him that D/F/Lieutenant Longuski was outside with police officers and he eventually wandered outside and asked what was going on. He recalled speaking with a MIPD officer, but did not recall the officers name. He did not recall the MIPD officer asking him any specific questions, but did recall the officer mentioning a bike being stolen. He did not witness all of the interaction between the trooper and D/F/Lieutenant Longuski and D/Sergeant Jordan, but during the portions he observed, he did not see the trooper pointing his finger at anyone and he did not know if D/Sergeant Jordan told the trooper that D/F/Lieutenant Longuski had nothing to do with the bike. D/Sergeant Heliin did not think any of the officers asked him for his name and contact information. He was not formally interviewed by any of the officers.

During the witness interview, Officer Morin said Trooper Akers stood in the doorway at Horn's Gaslight Bar and Restaurant and asked the doorman to contact D/F/Lieutenant Longuski and D/Sergeant Jordan and ask them to come outside. He said the group they were with was visible through the window. He denied that

| PAGE 5 of 41 | INVESTIGATED BY SPL/LT. RICK SEKELY | REPORTED BY SPL/LT. RICK SEKELY | REVIEWED BY JAN |
|---|---|---|---|

| Internal Affairs ORIGINAL INCIDENT REPORT | ORIGINAL DATE WED, July 11, 2018 | INCIDENT NO. IA-133-18 |
|---|---|---|
| | TIME RECEIVED | FILE CLASS 99009 |

Trooper Akers banged on the window and pointed to anybody inside to get them to come outside. He did not recall the exact words used by Trooper Akers, but he was "pretty sure" he asked them where the bike came from and why they had it. He confirmed that Trooper Akers asked them if they were police officers. Officer Morin denied that Trooper Akers pointed his finger at D/F/Lieutenant Longuski and D/Sergeant Jordan while he spoke to them. Officer Morin felt Trooper Akers' initial contact with D/F/Lieutenant Longuski and D/Sergeant Jordan was professional. Officer Morin was not asked to conduct any follow up investigation and although he did speak with members of the group, he did not conduct any formal interviews or speak to them about "anything really to do with the situation." He was not asked by Trooper Akers to conduct any interviews, obtain any names or contact information, or to conduct any follow up investigation. He did not collect or view any surveillance video related to the investigation. Officer Morin said he was not certain if it was the next day after the incident, or the next time he saw Trooper Akers, but Trooper Akers told him that video surveillance from the Pink Pony Bar showed D/Sergeant Jordan rode up to the Pink Pony Bar by himself. Officer Morin did not hear D/Sergeant Jordan tell Trooper Akers that D/F/Lieutenant Longuski didn't know anything about the bike. Officer Morin believed The Inn on Mackinac did have surveillance cameras, but he did not know if anyone attempted to get video from those cameras. He said most of the businesses on Mackinac Island did have surveillance cameras.

During the witness interview, Officer Kaminen said Trooper Akers went into Horn's Gaslight Bar and Restaurant and had D/F/Lieutenant Longuski and D/Sergeant Jordan go outside. Officer Kaminen did not see Trooper Akers bang on the window and point to anybody inside to get them to come outside. Officer Kaminen was not certain what Trooper Akers said to D/F/Lieutenant Longuski and D/Sergeant Jordan, once they were outside, but he believed Trooper Akers told them they were on a stolen bike. He did not see Trooper Akers point his finger at either D/F/Lieutenant Longuski or D/Sergeant Jordan. He believed Trooper Akers' contact with D/F/Lieutenant Longuski and D/Sergeant Jordan was professional and that D/F/Lieutenant Longuski and D/Sergeant Jordan "copped the attitude right off the bat." Officer Kaminen said it was possible that D/Sergeant Jordan told Trooper Akers that D/F/Lieutenant Longuski did not have anything to do with the bike, but he could not really say for sure. Officer Kaminen did not conduct any follow up investigation and he was not asked to do any follow up by Trooper Akers. He did not view or collect any surveillance video and was not asked to, but heard that one of the videos showed D/Sergeant Jordan rode up to the Pink Pony Bar, by himself, on the bike. He was not certain when he was told about the video, but believed it was the day after the incident. Officer Kaminen was not certain if The Inn on Mackinac or any businesses around there had video surveillance cameras and he did not know if any officers checked for VSF in those locations.

During the witness interview, Ms. Misty DeNoon said it was her, her husband, "Gary from Kalamazoo;" and "two other gentlemen" that went from the hotel to the Pink Pony Bar. She recalled "Andy" being with them when they traveled to the Pink Pony Bar, but said "Derrick" was not with them at that point. She said "Derrick" showed up at the Pink Pony a while later with two or three other people. Shortly after "Derrick" and the people he was with arrived, they all talked and decided to go to the bar down the street. She said they left as a group and went to Horn's Gaslight Bar and Restaurant. The group started walking toward Horn's Gaslight Bar and Restaurant when they noticed that "Derrick" had gotten on a bike. When they were at Horn's Gaslight Bar and Restaurant, she heard a banging on the window and turned around and saw it was police officers with one of the officers saying, "Get out here." She said some of the people in their group went outside, but she remained inside. She did not hear any conversation between the officers and D/F/Lieutenant

| PAGE 6 of 41 | INVESTIGATED BY SPL/LT. RICK SEKELY | | REPORTED BY SPL/LT. RICK SEKELY | | REVIEWED BY JAN |
|---|---|---|---|---|---|

| Internal Affairs ORIGINAL INCIDENT REPORT | ORIGINAL DATE WED, July 11, 2018 | INCIDENT NO. IA-133-18 |
|---|---|---|
| | TIME RECEIVED | FILE CLASS 99009 |

Longuski and D/Sergeant Jordan. She did not witness the officers' behavior and said there were other citizens standing on the sidewalk outside the bar and she lost track of the members of her group who were outside.

During the witness interview, D/Sergeant Jordan.

During the witness interview, Spl/Sergeant Horan said herself, her husband (D/Sergeant Horan), Detective Babycz and D/Sergeant Jordan walked from the hotel to the Pink Pony Bar. When they started out walking to the Pink Pony Bar, D/Sergeant Jordan was walking with them and at some point, he rode by them on a bike. She was not certain at what point D/Sergeant Jordan split off from them, where the bike came from, or at what point during their walk he showed up with the bike. Once they were at the Pink Pony Bar, they met up with D/F/Lieutenant Longuski and the group he was with. She said they were not there very long. She believed she used the restroom and then both groups left and headed to another bar. She was not paying attention and did not witness D/Sergeant Jordan and D/F/Lieutenant Longuski on the bike, or being stopped by the police. When they were at Horn's Gaslight Bar and Restaurant, she was dancing and looked over and the table they

| PAGE 7 of 41 | INVESTIGATED BY SPL/LT. RICK SEKELY | REPORTED BY SPL/LT. RICK SEKELY | REVIEWED BY JAN |
|---|---|---|---|

| Internal Affairs ORIGINAL INCIDENT REPORT | ORIGINAL DATE WED, July 11, 2018 | INCIDENT NO. IA-133-18 |
|---|---|---|
| | TIME RECEIVED | FILE CLASS 99009 |

were all occupying was empty. She said remained inside the bar and had no interaction with law enforcement at all. She did not see the initial contact by the police at Horn's Gaslight Bar and Restaurant.

During the witness interview, Detective Babycz said he walked from the hotel to the Pink Pony Bar with D/Sergeant Jordan and others. While they were walking, D/Sergeant Jordan showed up at some point with a bike. While at Horn's Gaslight Bar and Restaurant, the police officers knocked on the window and gestured to D/Sergeant Jordan and D/F/Lieutenant Longuski to go outside. Detective Babycz remained inside the bar. He could not hear what was being said between the officers and D/F/Lieutenant Longuski and D/Sergeant Jordan, but it appeared to him, that it was a tense interaction. Detective Babycz said it appeared to him that the situation was "escalating pretty quickly" and the cops looked like they were "getting pissed off." He said the police officers were finger pointing, but he could not say for certain whether or not D/Sergeant Jordan and D/F/Lieutenant Longuski were doing it. Detective Babycz said D/Sergeant Jordan, D/F/Lieutenant Longuski, and the police officers then moved from in front of the bar and out of his sight and he remained inside the bar and did not go outside. He said after about a half an hour, when D/Sergeant Jordan and D/F/Lieutenant Longuski had not returned, he and some of the other group members walked outside and went to where they were at, by the MIPD. When he got to the MIPD, he could hear loud voices and see some finger pointing. He did not get close enough to hear exactly what was being said, but it appeared to him to have turned into kind of a "yelling match."

A review of the video identified as "Surveillance Cam 1" revealed that D/Sergeant Jordan rode a bike in the street in front of the Pink Pony Bar, rode in a circle around three other people walking across the street toward the Pink Pony Bar, and then parked the bike on the side of the street in front of the Pink Pony Bar. D/Sergeant Jordan appeared to converse with the three people who were crossing the street as they walked onto the sidewalk who appeared to be two males and one female (none appeared to be D/F/Lieutenant Longuski). D/Sergeant Jordan and three other people entered the Pink Pony Bar. Approximately 17 minutes later, D/Sergeant Jordan and D/F/Lieutenant Longuski exited the Pink Pony Bar. D/F/Lieutenant Longuski turned toward his left as he exited the door and D/Sergeant Jordan turned toward his right as he exited the door and began walking toward the bike that he had parked at the curb. D/Sergeant Jordan walked toward the bike, headed in the opposite direction as D/F/Lieutenant Longuski, and appeared to turn his head toward D/F/Lieutenant Longuski and at the same time pointed toward the bike. D/F/Lieutenant Longuski remained on the sidewalk in front of the Pink Pony Bar. At approximately 11:11:29 p.m., other people exited the bar, walked over toward and stood near D/F/Lieutenant Longuski. At the same time, D/Sergeant Jordan got on the bike and headed toward D/F/Lieutenant Longuski and the others. As D/Sergeant Jordan got on the bike, he dropped what appeared to be a coat on the ground. D/Sergeant Jordan circled around, grabbed the coat, turned the bike around and began heading back toward the group of people. D/Sergeant Jordan rode the bike past the group of people who were gathered on the sidewalk in front of the Pink Pony Bar. As he rode past them, D/F/Lieutenant Longuski walked off the sidewalk into the roadway with his arm out and appeared to be trying to flag D/Sergeant Jordan down. D/Sergeant Jordan continued to ride the bike away from D/F/Lieutenant Longuski and the group of people. D/F/Lieutenant Longuski continued on foot in the direction of D/Sergeant Jordan. D/Sergeant Jordan stopped the bike and D/F/Lieutenant Longuski got on the bike and they rode out of view of the camera. The group of other people continued walking on the sidewalk, and headed in their direction. What appeared to be two police officers on bicycles appeared in the view of the camera from the opposite direction and headed in the direction that D/Sergeant Jordan and D/F/Lieutenant Longuski had traveled.

| PAGE 8 of 41 | INVESTIGATED BY SPL/LT. RICK SEKELY | REPORTED BY SPL/LT. RICK SEKELY | REVIEWED BY JAN |
|---|---|---|---|

| Internal Affairs | ORIGINAL DATE | INCIDENT NO. |
| ORIGINAL INCIDENT | WED, July 11, 2018 | IA-133-18 |
| REPORT | TIME RECEIVED | FILE CLASS |
| | | 99009 |

A review of the video identified as "Surveillance sidewalk" revealed that D/Sergeant Jordan and D/F/Lieutenant Longuski appeared in the camera view as they rode together on a bike. D/Sergeant Jordan was operating the bike and was in front with D/F/Lieutenant Longuski riding in back and seated on the seat. They stopped on the side of the road in front of the bar. As they came to a stop, a police officer (Trooper Akers) rode up beside them on his bike. D/Sergeant Jordan was standing with his feet on the ground, straddling the bike and was looking at the front of the bar and the people on the sidewalk. D/F/Lieutenant Longuski's head was turned the opposite direction, toward Trooper Akers. D/F/Lieutenant Longuski dismounted the bike in a normal fashion, stepped toward Trooper Akers, and appeared to interact verbally with him. D/Sergeant Jordan, still straddling the bike and holding the handle bar with his left hand, turned his head and attention toward D/F/Lieutenant Longuski and Trooper Akers, dismounted the bike in a normal fashion, leaned toward D/F/Lieutenant Longuski and Trooper Akers with his left hand still holding the handle bar of the bike, and appeared to interact verbally with one, or both of them. While still holding the left handle bar of the bike with his left hand, D/Sergeant Jordan used his right foot and put the bike kickstand down. He set the bike on the kickstand, let go of the handlebar and walked toward D/F/Lieutenant Longuski and Trooper Akers. As D/Sergeant Jordan walked toward D/F/Lieutenant Longuski and Trooper Akers, the bike rolled forward and fell on its left side. Trooper Akers appeared to address D/Sergeant Jordan who immediately turned around, walked back over to the bike, picked it up and placed it upright on the kickstand near the curb as Trooper Akers rode away.

A review of the video identified as "Video 1" revealed that D/Sergeant Jordan came into view of Officer Morin's body worn camera. D/Sergeant Heliin asked D/Sergeant Jordan if he was "good." D/Sergeant Jordan said, "I'm good man.", and shook D/Sergeant Heliin's hand. D/Sergeant Jordan then walked past D/Sergeant Heliin and grabbed a bike and began walking toward the street with it. Officer Morin was heard to say that some people were there to pick the bike up and D/Sergeant Jordan stopped. Officer Morin walked toward the street to look for the bike owners and Trooper Akers appeared in view of Officer Morin's body camera and spoke to Officer Morin. Officer Morin explained to Trooper Akers that the bike owners were just there to pick the bike up and would be back shortly. The officers and group of people were standing around for a moment and D/Sergeant Jordan could be heard asking Trooper Akers if they were "good." Trooper Akers and D/Sergeant Jordan shook hands and the officers and group of people parted ways.

During the administrative interview,

| PAGE | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
| 9 of 41 | SPL/LT. RICK SEKELY | SPL/LT. RICK SEKELY | JAN |

Internal Affairs
ORIGINAL INCIDENT
REPORT

| ORIGINAL DATE | INCIDENT NO. |
|---|---|
| WED, July 11, 2018 | IA-133-18 |
| TIME RECEIVED | FILE CLASS |
| | 99009 |

| PAGE | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
|---|---|---|---|
| 10 of 41 | SPL/LT. RICK SEKELY | SPL/LT. RICK SEKELY | JAN |

| Internal Affairs ORIGINAL INCIDENT REPORT | ORIGINAL DATE WED, July 11, 2018 | INCIDENT NO. IA-133-18 |
|---|---|---|
| | TIME RECEIVED | FILE CLASS 99009 |

**VENUE:**
MACKINAC COUNTY, MACKINAC ISLAND

**DATE & TIME:**
BETWEEN FRIDAY, MAY 18, 2018, AT 11 P.M. AND TUESDAY, MAY 22, 2018 AT 5 P.M.

**DATE MANAGEMENT AWARE:**
On May 18, 2018, D/F/Lieutenant Longuski became aware of the allegation that Trooper Akers was unprofessional when he contacted D/F/Lieutenant Longuski and D/Sergeant Jordan in front of Hom's Gaslight Bar and Restaurant. D/F/Lieutenant Longuski became aware of the remaining allegations against Trooper Akers when D/F/Lieutenant Longuski obtained a copy of the police report while at a court hearing on May 29, 2018.

**BLUE TEAM ADMINISTRATIVE COMPLAINT REPORT SUMMARY:**
On July 11, 2018, D/F/Lieutenant Longuski submitted a Blue Team Administrative Complaint Report (BTACR). In the report, D/F/Lieutenant Longuski wrote, in part, the following information.

During the conduction of complaint 83-600-18, Trooper Ryan Akers knowingly excluded material facts and evidence from the complaint. Trooper Akers the shirked his duties when the partial video obtained showed facts that contradicted 'theories' he placed in the complaint. The video directly destroys the facts that were used to obtain charges on Longuski and Jordan. Akers must have become aware of the inconsistencies and chose not to correct a report and contact the prosecutor prior to arraignment. This dereliction of duty has caused great embarrassment to the Michigan State Police. Akers downloaded video showing Longuski and Jordan getting off the bike in front of the Horn. Akers failed to retrieve video from the same camera and DVR system, (which he had to view when getting the video from 15 minutes earlier) of where contact was made with both troopers. This video was vital to the disorderly conduct charge. It was omitted by Akers due to his aggressive behavior even though he knew that video existed. Akers disregarded statements by Jordan advising Longuski was not with him and didn't know anything about the bike. This was stated at least two times heard by Longuski, and a 30 year veteran officer from Kalamazoo PD. Jordan readily admits he told the officer this fact. Assuming it is not intentional, certain facts Akers placed in the report that were used to obtain charges were not supported by the video Akers chose to include in his report. Akers shirks his responsibility by failing to correct this prior to arraignment. Akers reports he observes Jordan get on the bike at the curb at the Pink Pony and then Longuski got on behind him. Video shows Jordan got on the bike by himself. Jordan rode down the road to the rest of the crowd where Longuski stops him. This was a key fact in Akers accusing Longuski of guilty knowledge which was incorrect. Akers 'belief' that the bike was stolen twice theory. Video shows this is also not correct as Jordan is on video riding the bike up to the Pink Pony alone at 11PM. This is another key fact he used that Longuski is involved. Akers states when

| PAGE 11 of 41 | INVESTIGATED BY SPL/LT. RICK SEKELY | REPORTED BY SPL/LT. RICK SEKELY | REVIEWED BY JAN |
|---|---|---|---|

| Internal Affairs ORIGINAL INCIDENT REPORT | ORIGINAL DATE WED, July 11, 2018 | INCIDENT NO. IA-133-18 |
|---|---|---|
| | TIME RECEIVED | FILE CLASS 99009 |

stopped on the bike both subjects jumped from the bike and let if fall to the ground. Video shows we dismount without any signs of intoxication. Jordan puts the kickstand down but the bike rolls forward and falls to the ground it is immediately picked up by Jordan. Akers advised Jordan didn't return the bike when asked. Video and audio shows Jordan walking pushing the bike to return it. When one of the Mackinaw City Officer states the owners were already there to get the bike. He asked the trooper if they are good they shake hands and Jordan departs. Akers does not conduct a proper investigation. He was only accusatory and never asked basic investigative questions that would have led to a better conclusion. Last was the unprofessional contact in front of the Horn by hitting the window. Akers chose not to include this video but we were called out as cops and then publically humiliated them.

D/F/Lieutenant Longuski listed four witnesses in the BTACR, D/Sergeants Horan and Jordan, D/Sergeant DeNoon, and Detective Gaudard. A copy of the BTACR was attached as an external document.

## ORIGINAL INCIDENT REPORT SUMMARY:

Trooper Akers completed eAICS Original Incident Report No. 83-600-18 regarding the larceny and disorderly conduct investigation. The Original Incident Report was submitted to the Mackinac County Prosecutor's Office on May 21, 2018, and criminal charges of larceny under two hundred dollars and disorderly conduct-disturbing the peace were issued against D/F/Lieutenant Longuski and D/Sergeant Jordan on May 22, 2018. Below are excerpts from Trooper Akers' report as they relate to the allegations made by D/F/Lieutenant Longuski.

Under the heading of "INITIAL OBSERVATION/TRAFFIC STOP," Trooper Akers wrote, in part, the following information.

> While observing traffic on Main St, I observed two men exit the Pink Pony. These men were later identified as D/Sgt. Jordan and D/F/Lt. Longuski, although I didn't recognize them at the time. D/Sgt Jordan got on a bike that was parked at the curb, and D/F/Lt. Longuski got on behind him. I rode down after them and caught up to them as they approached Horns. I said, "Guys, you can't ride double. That's actually Michigan law." Both jumped off, letting the bike fall to the road (it fell on its left side). They apologized, saying they didn't realize it was the law. It was readily apparent that both D/Sgt Jordan and D/F/Lt. Longuski were intoxicated. The bike was still laying in the roadway, so I asked them to park it at the curb, which one of them did. They both then went into Horns Bar, and I rode away.

Trooper Akers wrote that after the initial contact with D/F/Lieutenant Longuski and D/Sergeant Jordan, Officer Kaminen ran the bike registration, determined that the owner was an employee on Mackinac Island, and passed that information on to Trooper Akers. Trooper Akers interviewed the bike owner and determined that the bike had been stolen.

Under the heading of "RECONTACT SUSPECTS," Trooper Akers wrote, in part, the following information.

> We went to the door of Horns and both men were actually very near the door, so we motioned them out. I asked them both, "Are you cops?" They both answered, "Yes." I pointed to the bicycle and asked, "Then why are you stealing someone else's bicycle?" They both reacted and denied stealing a bicycle. When we got to the police department, I explained to both of them I was pretty disappointed to see a

| PAGE 12 of 41 | INVESTIGATED BY SPL/LT. RICK SEKELY | REPORTED BY SPL/LT. RICK SEKELY | REVIEWED BY JAN |
|---|---|---|---|

| Internal Affairs ORIGINAL INCIDENT REPORT | ORIGINAL DATE WED, July 11, 2018 | INCIDENT NO. IA-133-18 |
|---|---|---|
| | TIME RECEIVED | FILE CLASS 99009 |

Michigan State Police sergeant and lieutenant acting like irresponsible, entitled drunks. I pointed out the bike they took belonged to a foreign worker from Eastern Europe here on a visa. I told them if we had not recovered it she probably would have had to wait another paycheck or two before she could afford to replace it. Both D/Sgt Jordan and D/F/Lt Longuski asked me why they would steal a bike that they "wouldn't even buy"? D/F/Lt Longuski was very confrontational and said, "If you are going to book me for possessing a stolen bike, let's go. Otherwise I'm going back to the bar." The group he was with started saying, "Andy, calm down." I asked him if he understood where I was coming from, that they were troopers acting in a way troopers are not expected to act, and that the bike he was on was not his. D/F/Lt Longuski said he understood, but said he had no knowledge of whose bike it was and was just riding with his friend, referring to D/Sgt Jordan. He said I needed to be careful and that I was disrespectful the way I called them out like I did. He asked if he was free to go, and I said he was. He then left with part of the group and walked back toward Horns. D/Sgt Jordan was considerably calmer and I tried to find out where he got the bike from, since he had been the one in front and pedaling. He said, "My friend told me I could take this bike." I tried to ask him who that friend was but he distinctly avoided the question. I asked him if he rode this bike from Mission Point (where everyone was staying for the convention) and he said he didn't. He insisted a friend allowed him to ride the bike from the Pink Pony but wouldn't identify this friend. I finally said to D/Sgt Jordan, "Why we don't we return this bike then?" meaning I was taking him up on his offer to go back and apologize. He said, "Ok, let's go." He then walked off with the rest of his group and left me with the bike, apparently not meaning what he said about going and apologizing.

Under the heading of "FURTHER INFORMATION REGARDING CHARGES," Trooper Akers wrote, in part, the following information.

Based on all of this, I believe someone else--an unknown person--stole the bike from The Inn on Mackinac earlier in the evening and rode it to the Pink Pony. D/Sgt Jordan and D/F/Lt Longuski then came out of the Pink Pony and took the bicycle for their own use, stealing it a second time. The bicycle was moved and taken without the owner's permission. D/Sgt Jordan specifically said he received permission from a friend, but this appears to be a lie, as an employee of the Pink Pony who was completely sober at the time witnessed the incident. Never once did she hear permission being given from anyone to ride the bike, and in fact she heard D/Sgt Jordan being accused of stealing it. D/Sgt Jordan himself states he had not ridden on that bike prior to leaving the Pink Pony and when I saw him on it was the first time he rode it. This would indicate D/F/Lt Longuski would have known it was not D/Sgt Jordan's bike, and the comments made about it being stolen were all said in his hearing according to the witness. Finally, both D/Sgt Jordan and D/F/Lt Longuski did not return the bike, despite having an opportunity to do so once I informed them it was stolen. They appeared to have no intention of returning it despite my suggestion to do so. It is reasonable to think               . would have been permanently deprived of her bike unless I had intervened. Finally, their disorderly conduct consisted of their frequent use of profane language, their riding a bicycle in an unsafe manner, stealing a bicycle which is directly contradictory to their profession as troopers, and their lack of concern for others' safety in leaving the bicycle in the road. All of this behavior appeared to be directly related to their obvious intoxication.

| PAGE 13 of 41 | INVESTIGATED BY SPL/LT. RICK SEKELY | REPORTED BY SPL/LT. RICK SEKELY | REVIEWED BY JAN |
|---|---|---|---|

| Internal Affairs ORIGINAL INCIDENT REPORT | ORIGINAL DATE WED, July 11, 2018 | INCIDENT NO. 1A-133-18 |
|---|---|---|
| | TIME RECEIVED | FILE CLASS 99009 |

Under the heading of "FURTHER ACTION TO BE TAKEN," Trooper Akers wrote the following information, "Ofc Morin's body camera footage will saved to a disc and added to property at future date."

Under the heading of "STATUS, Trooper Akers wrote the following information, "OPEN, warrant request submitted to the Mackinac County Prosecutor for larceny less than $200 and disorderly conduct."

A copy of the original incident report was attached as an external document.

SUPPLEMENTAL INCIDENT REPORT SUMMARY:
D/Sergeant Demers completed eAICS Supplemental Incident Report No. 001 for eAICS Original Incident Report No. 83-600-18. The Supplemental Incident Report was submitted to the Mackinac County Prosecutor's Office after criminal charges of larceny under two hundred dollars and disorderly conduct-disturbing the peace were issued against D/F/Lieutenant Longuski and D/Sergeant Jordan on May 22, 2018. The Supplemental Incident Report mostly consisted of the arrest information, but did include that D/Sergeant Demers obtained two thumb drives that contained VSF. Property item No. 002 was listed as a thumb drive that contained VSF from the body camera of the MIPD officers. Property item No. 003 was listed as a thumb drive that contained VSF from the Chippewa Hotel, Pink Pony Bar, and Horn's Gaslight Bar and Restaurant on May 18, 2018, on Mackinac Island. Regarding property item No. 002, D/Sergeant Demers wrote the following information, "This body-cam footage shows the interaction that law enforcement on Mackinac Island had with the suspects, as well as a interview with a witness. Regarding property item No. 003, D/Sergeant Demers wrote the following information, "This surveillance footage shows the suspects riding upon the stolen bicycle, and some of their interactions in/about some of the local establishments on the island."

A copy of the Supplemental Incident Report was attached as an external document.

MACKINAC ISLAND POLICE DEPARTMENT REPORT SUMMARY:
Officer Kaminen completed MIPD Incident Report No. 18-000034. Under the heading of investigation, Officer Kaminen wrote the following information.

R.O. was on foot patrol walking on the sidewalk south direction across the street from Horn's Bar. R.O. observed a bike travelling from the same direction with two subjects double riding the bike and parking on the street in front of Horn's Bar. One subject was a b/m who was peddling the bike with another w/m riding on the back of the bike. R.O. observed this at the same time Tpr. Akers and Ofc. Morin arrived to stop the subjects on patrol bikes. R.O. observed these two subjects a couple of minutes prior to the incident walking out of the Pink Pony Bar before riding the bike. Tpr. Akers informed both subjects it was illegal to double ride on a bike designed for one person. Both subjects dismounted the bike in front of Horn's Bar and let the bike fall to the ground without care. Tpr. Akers informed the subjects to pick up the bike. The b/m subject picked the bike up and left it parked half in the middle of the street and both subjects walked to Horn's Bar. R.O. noticed the bike the subjects were riding was a female bike with registration stickers for Mackinac Island. R.O. suspected the two subjects had unlawfully taken the bike to use without owner's permission. R.O. copied the registration on the bike and looked up the owner of the bike. The registration on the bike belonged to                  an employee of the Inn on Mackinac Hotel. R.O. notified Tpr. Akers of this finding. Tpr. Akers

| PAGE 14 of 41 | INVESTIGATED BY SPL/LT. RICK SEKELY | REPORTED BY SPL/LT. RICK SEKELY | REVIEWED BY JAN |
|---|---|---|---|

| Internal Affairs<br>ORIGINAL INCIDENT<br>REPORT | ORIGINAL DATE<br>WED, July 11, 2018 | INCIDENT NO.<br>IA-133-18 |
|---|---|---|
| | TIME RECEIVED | FILE CLASS<br>99009 |

immediately contacted the owner of the bike, ' ⌐ ⌐ ⌐ ⌐ ⌐ , at the Inn on Mackinac Hotel.
informed Tpr. Akers that her bike had been stolen within minutes or prior to her finishing
her work shift. Tpr. Akers returned to in front of Horn's Bar and informed R.O. the bike the two
subjects were riding was a stolen bike. Tpr. Akers also informed R.O. the two subjects were Michigan
State Police Officers. Tpr. Akers entered Horn's Bar and contacted the two subjects about the incident.
Both subjects were escorted to MIPD to discuss the incident with them. While walking to MIPD, other
off duty MSP officers followed along behind to MIPD. The two subjects were identified as MSP
officers SGT. DERRICK LAMAR JORDAN and LT. ANDREW PAUL LONGUSKI. It was also
observed that both subjects along with the other members of the MSP group had been drinking and
appeared to be highly intoxicated. Officer Morin had activated his body cam for the discussion at
MIPD involving the incident.

A copy of the MIPD report was attached as an external document.

**CONTACT WITH D/SGT. GARY DEMERS:**
On July 17, 2018, D/Sergeant Demers was contacted via telephone to obtain additional information because
the report had restricted access in eAICS. D/Sergeant Demers was assigned to the St. Ignace Post and was the
Acting Post Commander. The following information was requested; additional supplemental reports, a
copy of the journal sheet, a copy of the warrant request, all external documents for the complaint, the date and
time stamp on when the original report was submitted, the date and time it was reviewed and by whom, the
date and time supplemental report No. 001 was submitted and the date and time it was reviewed and by whom,
a copy of the criminal history dissemination log that indicated the date and time the report was originally
submitted to the prosecutor and by whom, and what reports and/or documents and/or videos were submitted to
the prosecutor when the report was originally submitted. On July 19, 2018, I received the requested
information and documents from D/Sergeant Demers via email. Also on July 19, 2018, at 9:40 a.m. contact
was made with D/Sergeant Demers via telephone and he confirmed that he reviewed the Original Incident
Report on May 21, 2018, and hand delivered it to the prosecutor on that same date. When he submitted the
report, it did not contain any external documents or video (information had not been obtained at that point).
He submitted only the original eAICS incident report. He completed Supplemental Incident Report No. 001,
viewed the videos, and summarized them in the supplemental report. He reviewed Supplemental Incident
Report No. 001 on May 24, 2018, two days after charges had been authorized. He was not certain when the
supplemental report and videos were submitted to the prosecutor. On August 6, 2018, contact was made with
D/Sergeant Demers about who provided him with the videos and he said Trooper Izzard delivered the videos
to him. He said Trooper Izzard was also assigned to the Mackinac Island Detail.

**EMAILS EXCHANGED WITH D/SERGEANT DEMERS:**
D/Sergeant Demers and I exchanged emails regarding the requests for additional information and documents.
The emails were attached as external documents.

**WARRANT REQUEST SUMMARY:**
D/Sergeant Demers provided a copy of the Mackinac County warrant requests that were submitted for
D/F/Lieutenant Longuski and D/Sergeant Jordan. Both warrant requests listed the following under the
"Charge requested" section:

| PAGE<br>15 of 41 | INVESTIGATED BY<br>SPL/LT. RICK SEKELY | REPORTED BY<br>SPL/LT. RICK SEKELY | REVIEWED BY<br>JAN |
|---|---|---|---|

| Internal Affairs ORIGINAL INCIDENT REPORT | ORIGINAL DATE WED, July 11, 2018 | INCIDENT NO. 1A-133-18 |
|---|---|---|
| | TIME RECEIVED | FILE CLASS 99009 |

1) Larceny of a bicycle less than $200
2) Disorderly conduct

Both warrant requests listed the following under the "Thoughts re. Plea" section: "I believe he should be charged with disorderly at a minimum and larceny because he knew better."

A stamp on the warrant requests indicated the request was received at the Mackinac County Prosecutor's Office on May 21, 2018. A copy of the warrant requests was attached as an external document.

**CASE SUPERVISION SHEET SUMMARY FOR INCIDENT REPORT 83-600-18:**
The case supervision sheet had an initial entry that indicated D/Sergeant Demers reviewed Supplemental Incident Report No. 001 on May 24, 2018, and that the case was pending court and property. The remaining entries, through July 18, 2018, indicated a monthly review and current court status'. A copy of the case supervision sheet was attached as an external document.

**CRIMINAL HISTORY DISSEMINATION LOG SUMMARY:**
D/Sergeant Demers provided a photocopy of a hand-written page from a notebook that contained the suspect names, complaint numbers and dates when the complaint, along with the criminal history, was submitted to the prosecutor's office. The pages had the following information as it related to D/F/Lieutenant Longuski and D/Sergeant Jordan.

| Derrick Jordan | 5-21-18 | 83-600-18 | MAC |
| Andrew Longuski | 5-21-18 | 83-600-18 | MAC |

A copy of the criminal history dissemination log was attached as an external document.

**OFFICER DAILIES:**
Trooper Aker's Field Services Bureau Automated Dailies (Officer Daily), UD-2X, for May 18, 2018, May 19, 2018, May 21, 2018, and May 24, 2018, were reviewed. The Officer Daily for May 18, 2018, indicated Trooper Akers issued a verbal warning to "Derrick Lamar Jordan,                    ' for "8310" and "Andrew Paul Longuski,             ' for "8310." There was no complaint number generated on the Officer Daily. The Officer Daily for May 19, 2018, contained no indication that Trooper Akers had any activity related to complaint number 83-600-18. The Officer Daily for May 21, 2018, indicated Trooper Akers carried "SUPP" time on complaint number 83-600-18 with a description in the notes that read, "Log in, correct report." The Officer Daily for May 24, 2018, indicated Trooper Akers carried "SUPP" time on complaint number 83-600-18 with a description in the notes that read, "Carried arrests, suspect turned themselves in." He carried arrest codes, "5312 and 2399" for "Andrew Paul Longuski" and "Derrick Lamar Jordan." Copies of the Officer Dailies were attached as external documents.

**REVIEW OF VIDEOS:**
There were six videos associated with the investigation of complaint number 83-600-18. Copies of the videos were obtained by Spl/Lieutenant Croley from Capt. John Halpin. The videos were reviewed and summarized as they related to the allegations made by D/F/Lieutenant Longuski.

| PAGE 16 of 41 | INVESTIGATED BY SPL/LT. RICK SEKELY | REPORTED BY SPL/LT. RICK SEKELY | REVIEWED BY JAN |
|---|---|---|---|

| Internal Affairs | ORIGINAL DATE | | INCIDENT NO. |
| ORIGINAL INCIDENT | WED, July 11, 2018 | | IA-133-18 |
| REPORT | TIME RECEIVED | | FILE CLASS |
| | | | 99009 |

Video named "Surveillance cam 1."

This was reportedly video surveillance camera footage from a business across the street from the Pink Pony Bar, although there was not metadata included on the video to indicate that. The video contained no audio. The video was not clear enough to be able to state with certainty, from the video itself, the identity of the people observed. D/F/Lieutenant Longuski and D/Sergeant Jordan were interviewed, and they did not dispute it was them in the videos, where applicable. For clarity during the summary of the video, their names will be used, where applicable. The video began on May 18, 2018, at approximately 11 p.m. At 11 p.m. the video showed D/Sergeant Jordan rode a bicycle in the street in front of the Pink Pony Bar, rode in a circle around three other people walking across the street toward the Pink Pony Bar, and then parked the bike on the side of the street in front of the Pink Pony Bar. D/Sergeant Jordan appeared to have conversed with the three people, who appeared to be two males and one female (none appeared to be D/F/Lieutenant Longuski) who were crossing the street as they walked onto the sidewalk. D/Sergeant Jordan and three other people entered the Pink Pony Bar by approximately 11:00:58 p.m. At approximately 11:11:17 p.m., D/Sergeant Jordan and D/F/Lieutenant Longuski exited the Pink Pony Bar. D/F/Lieutenant Longuski turned toward his left as he exited the door and D/Sergeant Jordan turned toward his right as he exited the door and began walking toward the bike that he had parked at the curb. D/Sergeant Jordan walked toward the bike, headed in the opposite direction as D/F/Lieutenant Longuski, and appeared to turn his head toward D/F/Lieutenant Longuski and at the same time pointed toward the bike. D/F/Lieutenant Longuski remained on the sidewalk in front of the Pink Pony Bar. At approximately 11:11:29 p.m., other people exited the bar walked over toward and stood near D/F/Lieutenant Longuski. At the same time, D/Sergeant Jordan got on the bike and headed toward D/F/Lieutenant Longuski and the others. As D/Sergeant Jordan got on the bike, he dropped what appeared to be a coat on the ground. D/Sergeant Jordan circled around, grabbed the coat, turned the bike around, and began heading back toward the group of people. At approximately 11:11:46 p.m., D/Sergeant Jordan rode the bike past the group of people who were gathered on the sidewalk in front of the Pink Pony Bar. As he rode past them, D/F/Lieutenant Longuski walked off the sidewalk into the roadway with his arm out and appeared to be trying to flag D/Sergeant Jordan down. D/Sergeant Jordan continued to ride the bike away from D/F/Lieutenant Longuski and the group of people. D/F/Lieutenant Longuski continued on foot in the direction of D/Sergeant Jordan. At approximately 11:12 p.m., D/Sergeant Jordan stopped the bike and D/F/Lieutenant Longuski got on the bike and they rode out of view of the camera. The group of other people continued walking on the sidewalk, headed in their direction. At approximately 11:12:08 p.m., what appeared to be two police officers on bicycles appeared in the view of the camera from the opposite direction and headed in the direction that D/Sergeant Jordan and D/F/Lieutenant Longuski had traveled. The video ended at approximately 11:20:59 p.m. and appeared to have no other information relevant to the allegations.

Video named "Surveillance cam Pony front."

This was reportedly video surveillance camera footage covering the interior front portion of the Pink Pony Bar, although there was not metadata included on the video to indicate that. The video contained no audio. The video was not clear enough to be able to state with certainty, from the video itself, the identity of the people observed. D/F/Lieutenant Longuski and D/Sergeant Jordan were interviewed, and they did not dispute it was them in the videos, where applicable. For clarity during the summary of the video, their names will be used, where applicable. The video began on May 18, 2018, at approximately 11 p.m. At approximately 11:02:33 p.m., D/Sergeant Jordan came into view of the camera, walked up to the bar and sat down. At approximately 11:03:10 p.m., two female subjects entered the bar. D/Sergeant Jordan stood up, walked over

| PAGE | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
| 17 of 41 | SPL/LT. RICK SEKELY | SPL/LT. RICK SEKELY | JAN |

| Internal Affairs | ORIGINAL DATE | | INCIDENT NO. |
| --- | --- | --- | --- |
| ORIGINAL INCIDENT | WED, July 11, 2018 | | IA-133-18 |
| REPORT | TIME RECEIVED | | FILE CLASS |
| | | | 99009 |

to them, engaged them in conversation, and the three walked through the bar/restaurant and out of view of the camera. At approximately 11:08:29 p.m., D/Sergeant Jordan and D/F/Lieutenant Longuski appeared at the top of the screen standing with a group of people. At approximately 11:08:57 p.m., D/F/Lieutenant Longuski walked toward the camera and appeared to exit the business followed shortly by D/Sergeant Jordan and then seven other people. The video ended at approximately 11:15:58 p.m. and appeared to have no other information relevant to the allegations.

Video named "Surveillance lobby sidewalk."
This was reportedly video surveillance camera footage from a business on the same side of the street as the Pink Pony Bar, although there was not metadata included on the video to indicate that. The video contained no audio. The video was not clear enough to be able to state with certainty, from the video itself, the identity of the people observed. D/F/Lieutenant Longuski and D/Sergeant Jordan were interviewed, and they did not dispute it was them in the videos, where applicable. For clarity during the summary of the video, their names will be used, where applicable. The video began on May 18, 2018, at approximately 11 p.m. Beginning at approximately 11:08:50 p.m., the video appeared to simply a different angle of what was observed on the video named "Surveillance cam 1" and documented above. This video was much lower in quality and was more difficult to discern. The video ended at approximately 11:15:58 p.m. and appeared to have no other information relevant to the allegations.

Video named "Surveillance sidewalk."
This was reportedly video surveillance camera footage from the sidewalk and street located in front of Horn's Gaslight Bar and Restaurant, although there was not metadata included on the video to indicate that. The video contained no audio. The video was not clear enough to be able to state with certainty, from the video itself, the identity of the people observed. D/F/Lieutenant Longuski and D/Sergeant Jordan were interviewed, and they did not dispute it was them in the videos, where applicable. For clarity during the summary of the video, their names will be used, where applicable. The video began on May 18, 2018, at approximately 11:10 p.m. and showed people interacting on the sidewalk and near the edge of the road. Beginning at approximately 11:11:52 p.m., D/Sergeant Jordan and D/F/Lieutenant Longuski appeared in the camera view as they rode together on a bike. D/Sergeant Jordan was operating the bike and was in front with D/F/Lieutenant Longuski riding in back and seated on the seat. They stopped on the side of the road in front of the bar. As they came to a stop, a police officer (Trooper Akers) rode up beside them on his bike. D/Sergeant Jordan was standing with his feet on the ground, straddling the bike, and was looking at the front of the bar and the people on the sidewalk. D/F/Lieutenant Longuski's head was turned the opposite direction, toward Trooper Akers. D/F/Lieutenant Longuski dismounted the bike in a normal fashion, stepped toward Trooper Akers, and appeared to interact verbally with him. D/Sergeant Jordan, still straddling the bike and holding the handle bar with his left hand, turned his head and attention toward D/F/Lieutenant Longuski and Trooper Akers, dismounted the bike in a normal fashion, leaned toward D/F/Lieutenant Longuski and Trooper Akers with his left hand still holding the handle bar of the bike, and appeared to interact verbally with one, or both of them. While still holding the left handle bar of the bike with his left hand, D/Sergeant Jordan used his right foot and put the bike kickstand down. He set the bike on the kickstand, let go of the handlebar, and walked toward D/F/Lieutenant Longuski and Trooper Akers. At approximately 11:12:05 p.m., as D/Sergeant Jordan walked toward D/F/Lieutenant Longuski and Trooper Akers, the bike rolled forward and fell on its left side. At approximately 11:12:07 p.m., Trooper Akers appeared to address D/Sergeant Jordan who immediately turned around, walked back over to the bike, picked it up, and placed it upright on the kickstand near the curb as

| PAGE | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
| --- | --- | --- | --- |
| 18 of 41 | SFL/LT. RICK SEKELY | SFL/LT. RICK SEKELY | JAN |

| Internal Affairs ORIGINAL INCIDENT REPORT | ORIGINAL DATE WED, July 11, 2018 | INCIDENT NO. IA-133-18 |
|---|---|---|
| | TIME RECEIVED | FILE CLASS 99009 |

Trooper Akers rode away. This was approximately a 15 second interaction between Trooper Akers and D/Sergeant Jordan and D/F/Lieutenant Longuski. The remaining group of people that were with D/Sergeant Jordan and D/F/Lieutenant Longuski appeared in camera view at approximately 11:12:47 p.m. By 11:14:06 p.m. the group of people had entered Horn's Gaslight Bar and Restaurant. The video ended at approximately 11:20:59 p.m. and appeared to have no other information relevant to the allegations.

Video named "Video 1."
This was reportedly video from a MIPD body camera worn by Officer Morin that contained interaction with D/Sergeant Jordan and D/F/Lieutenant Longuski, along with other members of their group while near the MIPD, although there was not metadata included on the video to indicate that. The video contained audio. The video was not clear enough to be able to state with certainty, from the video itself, the identity of the people observed. D/F/Lieutenant Longuski and D/Sergeant Jordan were interviewed, and they did not dispute it was them in the videos, where applicable. For clarity during the summary of the video, their names will be used, where applicable. The video began on May 18, 2018, at approximately 11:44:54 p.m., with D/F/Lieutenant Longuski speaking with Trooper Akers and D/Sergeant Jordan speaking with Officer Kaminen. Officer Morin's body camera was recording while he stood a distance away from and facing them. Officer Morin then turned around and began speaking with one of the other members of the group, D/Sergeant Heliin. A short time later, Detective Gaudard and D/Sergeant DeNoon walked up to D/Sergeant Heliin and Officer Morin and inquired about what was happening. Since Officer Morin was the only one recording with his body worn camera and multiple conversations had taken place between different people at the same time, it was difficult to discern exactly what was being said at various times. At approximately 11:54:12 p.m., two male subjects approached Officer Morin, who was speaking with D/Sergeant Heliin. The two male subjects told Officer Morin that the bike in question was their girlfriend's bike and they were there to recover it. Officer Morin told the two that they were sorting the matter out and asked them to wait for a few minutes until they had a chance to sort it out. At the same time, D/Sergeant Jordan could be heard talking to Trooper Akers in the background. Beginning at approximately 11:55:07 p.m., D/Sergeant Jordan came into view of Officer Morin's body worn camera. D/Sergeant Heliin asked D/Sergeant Jordan if he was "good." D/Sergeant Jordan said, "I'm good man.", and shook D/Sergeant Heliin's hand. D/Sergeant Jordan then walked past D/Sergeant Heliin and grabbed a bike and began walking toward the street with it. Officer Morin was heard saying that some people were there to pick the bike up and D/Sergeant Jordan stopped. Officer Morin walked toward the street to look for the bike owners and Trooper Akers appeared in view of Officer Morin's body camera and spoke to Officer Morin. Officer Morin explained to Trooper Akers that the bike owners were just there to pick the bike up and would be back shortly. The officers and group of people were standing around for a moment and at approximately 11:56:00 p.m., D/Sergeant Jordan could be heard asking Trooper Akers if they were "good." Trooper Akers and D/Sergeant Jordan shook hands and the officers and group of people parted ways. The video ended at approximately 11:56:08 p.m.

Video named "Video 2."
This was reportedly video from a MIPD body camera worn by Officer Morin that contained Trooper Akers' interview with witness, Ms. Porscha Tarsetti. The video began on May 19, 2018, at approximately 1:01:54 a.m. The interview took place on the sidewalk in front of the Pink Pony Bar. There was a lot of background noise and it was difficult to determine exactly what questions were asked by Trooper Akers and the answer from Ms. Tarsetti. What could be heard appeared to be consistent with what Trooper Akers wrote in the

| PAGE 19 of 41 | INVESTIGATED BY SPL/LT. RICK SEKELY | REPORTED BY SPL/LT. RICK SEKELY | REVIEWED BY JAN |
|---|---|---|---|

| Internal Affairs<br>ORIGINAL INCIDENT<br>REPORT | ORIGINAL DATE<br>WED, July 11, 2018 | INCIDENT NO.<br>IA-133-18 |
|---|---|---|
| | TIME RECEIVED | FILE CLASS<br>99009 |

report regarding the interview with Ms. Tarsetti. No new information was learned as it related to the allegations against Trooper Akers. The video ended on May 19, 2018, at approximately 1:05:38 a.m.

**INTERVIEW COMPLAINANT--D/F/LT. ANDREW LONGUSKI:**

D/F/Lieutenant Longuski was interviewed at the Michigan State Police (MSP) Forensic Laboratory in Lansing, in his office in the Polygraph Section on July 18, 2018, at approximately 8:16 a.m. D/F/Lieutenant Longuski was the complainant in this internal investigation and he was reminded of such. Due to the fact that this internal investigation stemmed from another internal investigation (IA-095-18) where D/F/Lieutenant Longuski was the principal, had been arrested, and was still in the process of adjudication of the criminal proceedings, I read D/F/Lieutenant Longuski Official Order No. 1, Sections 4.35 and 4.35a. D/F/Lieutenant Longuski advised he understood what I had just read to him and had no questions. I ordered D/F/Lieutenant Longuski to answer my questions fully and truthfully. D/F/Lieutenant Longuski was informed that his failure to answer my questions fully and truthfully constituted an act of insubordination for which discipline would result, up to and including discharge. The interview was digitally recorded and a copy of the audio file has been attached as an external document. The interview is summarized below.

| PAGE<br>20 of 41 | INVESTIGATED BY<br>SPL/LT. RICK SEKELY | REPORTED BY<br>SPL/LT. RICK SEKELY | REVIEWED BY<br>JAN |
|---|---|---|---|

**Internal Affairs**
**ORIGINAL INCIDENT**
**REPORT**

| ORIGINAL DATE | INCIDENT NO. |
|---|---|
| WED, July 11, 2018 | 1A-133-18 |
| TIME RECEIVED | FILE CLASS |
| | 99009 |

D/F/Lieutenant Longuski provided a copy of eAICS Incident Report No. 83-600-18 that had areas in it that he highlighted and color coded. He indicated the yellow highlighted areas were problems with the report. The red highlighted areas were things that caused him to be charged criminally and the green highlighted areas were statements that he did in fact make. This information was covered in the BTACR and/or the interview. The highlighted copy of the report was attached as an external document.

He also provided me with a written statement, which appeared to be mostly a duplicate of the information he wrote in the BTACR, with some additional information that was discussed during the interview. The written statement was attached as an external document.

| PAGE | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
|---|---|---|---|
| 21 of 41 | SFL/LT. RICK SEKELY | SFL/LT. RICK SEKELY | JAN |

**Internal Affairs**
**ORIGINAL INCIDENT**
**REPORT**

| ORIGINAL DATE | INCIDENT NO. |
|---|---|
| WED, July 11, 2018 | IA-133-18 |
| TIME RECEIVED | FILE CLASS |
|  | 99009 |

**INTERVIEW WITNESS—D/SGT. NATHAN HORAN-MSP:**

D/Sergeant Horan was interviewed at the MSP Forensic Lab in Lansing, in the Polygraph Section on July 20, 2018, at approximately 8:30 a.m.  The interview was digitally recorded and a copy of the audio file has been attached as an external document.  The interview is summarized below.

D/Sergeant Horan confirmed that he was present on Mackinac Island on May 18, 2018, to attend a polygraph conference.  He said his wife, Spl/Sgt. Carissa Horan accompanied him to Mackinac Island and they arrived sometime around mid-afternoon on May 18, 2018.  He said he and his wife did not attend the banquet, they went to dinner by themselves.  He said he was generally familiar with the incident that led to the arrest of D/F/Lieutenant Longuski and D/Sergeant Jordan.  He said he had not personally viewed any video from the incident and had not read any of the police reports.  D/Sergeant Horan was asked if he went to the Pink Pony Bar and if so, who he went with.  He said he and his wife left the hotel with D/Sergeant Jordan and Detective Babycz.  He said Detective Babycz was a "county guy," but he could not recall what Sheriff's Department he worked for.  He was not certain what time they arrived at the Pink Pony Bar, but it was "late."  He said the four of them began walking from Mission Pointe toward the Pink Pony Bar.  He said at some point while they were walking, D/Sergeant Jordan split off from them.  He did not see him split off from them, at some point he was no longer walking with them and he did not know where he went, and he assumed that he went to use a restroom or something.  D/Sergeant Horan said himself, his wife, and Detective Babycz continued walking and a short time later, D/Sergeant Jordan approached them on a bike, rode a circle around them, and continued further down the street.  He said as they approached the Pink Pony Bar, D/Sergeant Jordan approached them again on the bike and then parked it at the curb and they all entered the Pink Pony Bar.  He said they were planning to meet up with D/F/Lieutenant Longuski, D/Sergeant Heliin, and some other people at the Pink Pony Bar.  He said he did not have any conversation with D/Sergeant Jordan about the bike.  D/Sergeant Horan said when they arrived at the Pink Pony Bar, they talked to D/F/Lieutenant Longuski and the group he was with and it was decided they were all going to go to Horn's Gaslight Bar and Restaurant.  D/Sergeant Horan said he believed he and his wife used the restroom at the Pink Pony Bar.  He said by the time he exited the Pink Pony Bar, he observed D/F/Lieutenant Longuski and D/Sergeant Jordan getting pulled over by police officers.  He said by the time he arrived at Horn's Gaslight Bar and Restaurant the police contact was over and the entire group people went into Horn's Gaslight Bar and Restaurant, got a table, and ordered some drinks.  He said he was on the dance floor with his wife and he observed a police officer come in and motion for D/F/Lieutenant Longuski and D/Sergeant Jordan to go outside.  He said he continued to watch from the dance floor and observed one of the police officers "kind of puffed up and in Andy's face, just pointing his finger at him."  D/Sergeant Horan said he began to wonder what was going on and some of the other members of their group started going outside.  D/Sergeant Horan said he moved closer to their table, which was next to the front window to get a closer look and that's when the police officers and members from their group walked down the street and out of view.  He said the table their group was at still had drinks on the table, coats and other personal belongings on it, so he and his wife remained at the bar.  A while later they came back and when he asked D/F/Lieutenant Longuski what happened, he was told that the officers were accusing him of stealing a bike.  D/Sergeant Horan did not hear any of the initial conversation between the officers and D/F/Lieutenant Longuski and D/Sergeant Jordan.  He did not personally speak with any of the police officers, and none of the police officers approached him and asked him questions, or for his name and contact information.  When asked if he felt he had relevant information to provide to investigators if he had been interviewed, and he said looking back on it, he felt he would have relevant information to offer to the investigation.

| PAGE | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
|---|---|---|---|
| 22 of 41 | SPL/LT. RICK SEKELY | SPL/LT. RICK SEKELY | JAN |

| Internal Affairs ORIGINAL INCIDENT REPORT | ORIGINAL DATE WED, July 11, 2018 | INCIDENT NO. IA-133-18 |
|---|---|---|
| | TIME RECEIVED | FILE CLASS 99009 |

**INTERVIEW WITNESS–DET. GARY GAUDARD–KALAMAZOO DEPT. OF PUBLIC SAFETY:**
Detective Gaudard was interviewed at Fire Station number 45 with the Kalamazoo Department of Public Safety (KDPS) on July 20, 2018, at approximately 10:32 a.m. The interview was digitally recorded and a copy of the audio file has been attached as an external document. The interview is summarized below.

Detective Gaudard confirmed that he was present on Mackinac Island on May 18, 2018, to attend a polygraph conference. He said he attended the dinner at the hotel and then himself, D/F/Lieutenant Longuski, D/Sergeant DeNoon, and Ms. DeNoon took a carriage ride to the Pink Pony Bar. He said the four of them were at the Pink Pony Bar for approximately an hour and were getting ready to leave when D/Sergeant Jordan arrived. He said they told D/Sergeant Jordan not to order a drink, that they were leaving and headed to Horn's Gaslight Bar and Restaurant. Detective Gaudard said within a few minutes of D/Sergeant Jordan's arrival, they all walked out onto the front porch of the Pink Pony Bar. He said he and D/F/Lieutenant Longuski went to the left and began walking toward Horn's Gaslight Bar and Restaurant while D/Sergeant Jordan went to the right and a few seconds later D/Sergeant Jordan came back by them riding a bike. Detective Gaudard said as D/Sergeant Jordan rode by, either D/F/Lieutenant Longuski or D/Sergeant Jordan made some statement about getting a ride. Detective Gaudard said D/F/Lieutenant Longuski "jogged down" to D/Sergeant Jordan and got on the bike with him. He said a few seconds after D/F/Lieutenant Longuski got on the bike, two or three uniformed officers rode by and made contact with D/F/Lieutenant Longuski and D/Sergeant Jordan. Detective Gaudard said he was not close enough to hear what was said between them, but the contact appeared brief. He said it did not seem like a big deal, it was not really talked about, and their group proceeded into Horn's Gaslight Bar and Restaurant. He said they obtained a table next to a front window and Detective Gaudard was right next to the window. Detective Gaudard said he heard banging on the window that somewhat startled him, and he turned around to see a uniformed trooper, attired in a fatigue style uniform. He said the trooper pointed and yelling through the glass window something to the effect of, "You and you, come here." Detective Gaudard said he initially thought it was a joke and turned to D/F/Lieutenant Longuski and said to him, "You must know this guy."

D/F/Lieutenant Longuski told Detective Gaudard he did not know the trooper. D/F/Lieutenant Longuski went outside to speak with the trooper and Detective Gaudard stood at the threshold of the door with the door open. He said the trooper immediately accused D/F/Lieutenant Longuski of stealing a bike. Detective Gaudard described the initial contact as tense. He said the trooper's tone and accusatory comments toward D/F/Lieutenant Longuski and D/Sergeant Jordan was not how he would have addressed another member of his own agency, especially members of a higher rank than him. He said he was shocked at how the young trooper was talking to command officers. When asked, Detective Gaudard said he did not hear any foul language used on the part of the trooper. He did not hear D/F/Lieutenant Longuski or D/Sergeant Jordan attempt to assert their rank into the matter, at least during the conversation he personally heard in front of the bar. Detective Gaudard said when D/Sergeant Jordan came outside, the first thing he said to the trooper was something to the effect that D/F/Lieutenant Longuski had nothing to do with it and it seemed to him that the trooper did not want to hear that. When asked, Detective Gaudard said he did not hear the trooper ask D/F/Lieutenant Longuski or D/Sergeant Jordan if they were police officers. Detective Gaudard said a decision was made to move the conversation away from the front of the bar and he stayed within eyesight of them, could hear them talking, he was not close enough to hear what was being said. He said he felt that it was a matter between MSP members. When asked, Detective Gaudard said he did not recall seeing the trooper point his finger at either D/F/Lieutenant Longuski or D/Sergeant Jordan once outside the bar. Detective Gaudard said it seemed

| PAGE 23 of 41 | INVESTIGATED BY SPL/LT. RICK SEKELY | REPORTED BY SPL/LT. RICK SEKELY | REVIEWED BY JAN |
|---|---|---|---|

| Internal Affairs ORIGINAL INCIDENT REPORT | ORIGINAL DATE WED, July 11, 2018 | INCIDENT NO. IA-133-18 |
|---|---|---|
| | TIME RECEIVED | FILE CLASS 99009 |

to him that the trooper did not want to listen to what D/F/Lieutenant Longuski and D/Sergeant Jordan were telling him, and it appeared to him that the trooper had made up his mind as to what happened. Detective Gaudard said he believed the trooper's contact with D/F/Lieutenant Longuski and D/Sergeant Jordan was unprofessional and further said that he would not talk to a citizen the way the trooper talked to them, let alone a command officer. When Detective Gaudard was asked if the trooper had asked questions of D/F/Lieutenant Longuski or D/Sergeant Jordan he said, "He was not in an investigative mode, he was in a full blown you did it mode."

He did speak with one of the MIPD officers, but it was not an interview and no statement was taken from him. He said none of the police officers approached him and asked him questions, or for his name and contact information. When asked if he felt he had relevant information to provide to investigators if he had been interviewed and said, "without a doubt" he would have had relevant information to offer to the investigation, especially regarding D/F/Lieutenant Longuski's involvement because he was with him the entire time, from the banquet dinner, to the carriage ride, to the Pink Pony Bar and then Horn's Gaslight Bar and Restaurant. When asked, he said he had not reviewed any video or police reports related to the investigation.

## INTERVIEW WITNESS–D/SGT. MIKE DENOON-KALAMAZOO COUNTY S.O.:

D/Sergeant DeNoon was interviewed at the Kalamazoo County Sheriff's Office on July 20, 2018, at approximately 11:28 a.m. The interview was digitally recorded and a copy of the audio file has been attached as an external document. The interview is summarized below.

D/Sergeant DeNoon confirmed that he was present on Mackinac Island on May 18, 2018, to attend a polygraph conference. His wife, Ms. DeNoon, accompanied him Mackinaw Island. He and his wife attended the dinner at the hotel and then himself, his wife, Detective Gaudard, D/F/Lieutenant Longuski, and "one other person, I'm not sure who that was, but it wasn't Derrick" all shared a carriage ride to the Pink Pony Bar. D/Sergeant DeNoon was not sure what time they went to the Pink Pony Bar, but he thought it had just started to get dark out. When asked, he thought they had been at the Pink Pony Bar at least an hour before D/Sergeant Jordan (Derrick) showed up. D/Sergeant DeNoon said shortly after D/Sergeant Jordan arrived, they all left and went to another bar down the road, but he did not recall the name of it. D/Sergeant DeNoon said he exited the Pink Pony Bar with his wife and headed toward the bar they were going to when he observed D/Sergeant Jordan riding a bike, headed in the same direction as they were. He said D/F/Lieutenant Longuski yelled to D/Sergeant Jordan, "Hold on a minute.¯", and then he went over and jumped on the seat of the bike. He said everyone was laughing and D/Sergeant Jordan began pedaling the bike with D/F/Lieutenant Longuski on the seated on the bike and then three police officers, also on bikes, rode up to them and stopped them. He said he was not close enough to hear the interaction between the officers and D/F/Lieutenant Longuski and D/Sergeant Jordan, but it was brief and appeared to him to be a cordial interaction. He after the police contact, the officers rode away, and their group went into the bar and sat at a large table in the front of the bar, next to a larger picture window. D/Sergeant DeNoon said he sat next to the window, with his back to the window. He said another husband and wife joined them, but he did not know who they were. He said it seemed to him like they were at the bar for "at least an hour" when he heard a banging on the window. He said he turned around and observed a trooper pointing into the bar at D/F/Lieutenant Longuski and directed him outside saying something to the effect of "out here now." D/Sergeant DeNoon said he started laughing because he thought it was a joke because maybe the trooper knew D/F/Lieutenant Longuski. He said D/F/Lieutenant Longuski and D/Sergeant Jordan went outside to speak with the trooper. D/Sergeant DeNoon

| PAGE 24 of 41 | INVESTIGATED BY SPL/LT. RICK SEKELY | REPORTED BY SPL/LT. RICK SEKELY | REVIEWED BY JAN |
|---|---|---|---|

| Internal Affairs | ORIGINAL DATE | INCIDENT NO. |
|---|---|---|
| ORIGINAL INCIDENT | WED, July 11, 2018 | IA-133-18 |
| REPORT | TIME RECEIVED | FILE CLASS |
| | | 99009 |

said he remained inside the bar, but observed the interaction through the window. He said he could not hear what was being said, but it appeared to him, from the trooper's body language, that the trooper was "reading the riot act" to D/F/Lieutenant Longuski and D/Sergeant Jordan. He said the officers and D/F/Lieutenant Longuski and D/Sergeant Jordan then walked up the hill to what he believed was the MIPD. He said Detective Gaudard said he was going to follow, so D/Sergeant DeNoon went with him. D/Sergeant DeNoon said once they were up at the MIPD, the trooper that had banged on the window was talking to D/F/Lieutenant Longuski and another officer was talking to D/Sergeant Jordan. He said he could not hear "verbatim" what was being said, but the trooper was being "aggressive" in the way he was talking to D/F/Lieutenant Longuski. D/Sergeant DeNoon said it seemed to him like the trooper was mad at D/F/Lieutenant Longuski about something. D/Sergeant DeNoon said the trooper's voice was raised, he was pointing his finger, and his "brow was furrowed." He said at some point, D/Sergeant Jordan walked over to he and Detective Gaudard and Detective Gaudard asked D/Sergeant Jordan what was going on. He said D/Sergeant Jordan said the officers accused him and D/F/Lieutenant Longuski of stealing a bike. D/Sergeant DeNoon said shortly after that he walked back to the bar by himself because his wife was still at there. D/Sergeant DeNoon said he had been a police officer for 22 years and could not recall ever addressing someone in the manner that the trooper addressed D/F/Lieutenant Longuski. He said it was "embarrassing." When asked, he said he did not hear the trooper use any vulgar language. When asked, D/Sergeant DeNoon said none of the officers interviewed him and none of them asked him for his name and contact information. He felt he would have had relevant information to offer to the larceny investigation had he been asked by the officers. When asked, he said he did not know whether or not D/Sergeant Jordan told the trooper that D/F/Lieutenant Longuski was not involved with, or had nothing to do with the bike.

### INTERVIEW WITNESS–D/SGT. TIM HELIIN-MSP:

D/Sergeant Heliin was interviewed at his residence on July 25, 2018, at approximately 9:05 a.m. The interview brief and was not recorded. The interview is summarized below.

D/Sergeant Heliin confirmed that he was present on Mackinac Island on May 18, 2018, to attend a polygraph conference. He was generally aware of the incident that led to the arrest of D/F/Lieutenant Longuski and D/Sergeant Jordan. He had not reviewed any video or police reports related to that investigation. He did not recall exactly what time they arrived at the Pink Pony Bar. He knew he went there with D/F/Lieutenant Longuski and others, but did not recall exactly who the other people were. He was not sure if D/Sergeant Jordan traveled with them to the Pink Pony Bar, or not, but he did not think he did. He did not recall any information from when the group left the Pink Pony Bar. He said when they were at the other bar, he was on the dance floor with D/Sergeant Horan and his wife, Spl/Sergeant Horan. D/Sergeant Heliin said he did not witness the manner in which Trooper Akers made contact with D/F/Lieutenant Longuski and D/Sergeant Jordan. He said it was pointed out to him that D/F/Lieutenant Longuski was outside with police officers and he eventually wandered outside and asked what was going on. He did recall speaking with a MIPD officer, but he did not recall the officer's name. He did not recall the MIPD officer asking him any specific questions, but did recall the officer mentioning a bike being stolen. He did not witness all of the interaction between the trooper and D/F/Lieutenant Longuski and D/Sergeant Jordan, but during the portions he observed, he did not see the trooper pointing his finger at anyone and he did not know if D/Sergeant Jordan told the trooper that D/F/Lieutenant Longuski had nothing to do with the bike. When asked, D/Sergeant Heliin said he did not think any of the officers asked him for his name and contact information. He said he may have volunteered it, but he was not sure. He said he was not formally interviewed by any of the officers. When asked, he said if

| | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
|---|---|---|---|
| PAGE | SPL/LT. RICK SEKELY | SPL/LT. RICK SEKELY | JAN |
| 25 of 41 | | | |

| Internal Affairs ORIGINAL INCIDENT REPORT | ORIGINAL DATE WED. July 11, 2018 | | INCIDENT NO. IA-133-18 |
|---|---|---|---|
| | TIME RECEIVED | | FILE CLASS 99009 |

he had been interviewed, he may have been able to provide relevant information about the larceny as to who was with who and when.

## INTERVIEW WITNESS–OFCR. KURTIS MORIN-MIPD:

Officer Morin was interviewed via telephone on July 25, 2018, at approximately 12:44 p.m. The interview was digitally recorded and a copy of the audio file has been attached as an external document. The interview is summarized below.

Officer Morin was asked how Trooper Akers made contact with D/F/Lieutenant Longuski and D/Sergeant Jordan at Horn's Gaslight Bar and Restaurant, after it was determined that the bike they had been riding was stolen. Officer Morin said he asked the "doorman" to contact them and ask them to come outside. When asked, he said the group that D/F/Lieutenant Longuski and D/Sergeant Jordan were with was visible through the window. Officer Morin was asked if Trooper Akers entered the bar to speak to get them to come outside and Officer Morin said Trooper Akers stood in the doorway. He was asked if Trooper Akers banged on the window and pointed to anybody inside to get them to come outside and Officer Morin said, "negative." Officer Morin was asked if he recalled what Trooper Akers said to D/F/Lieutenant Longuski and D/Sergeant Jordan, once they were outside. Officer Morin said he could not recall the exact words, but he was "pretty sure" he asked them where the bike came from and why they had it. He confirmed that Trooper Akers asked them if they were police officers and when asked if they responded to Trooper Akers, he said they did acknowledge they were police officers, but it seemed to him that they were reluctant to do so. Officer Morin was asked if Trooper Akers asked D/F/Lieutenant Longuski and D/Sergeant Jordan if they stole the bike, or if he accused them of doing so. Officer Morin said, "I don't think he said the word stole, I think he asked where the bike came from." When asked, Officer Morin denied that Trooper Akers pointed his finger at D/F/Lieutenant Longuski or D/Sergeant Jordan while he spoke to them. Officer Morin was asked if he felt Trooper Akers' initial contact with D/F/Lieutenant Longuski and D/Sergeant Jordan regarding the stolen bike was unprofessional and he said, "Not at all." Officer Morin was asked if he conducted any follow up investigation related to the larceny and disorderly investigation, after him, Officer Kaminen, and Trooper Akers broke contact with D/F/Lieutenant Longuski and D/Sergeant Jordan and their group. He said he did not conduct any follow up, but members of the group did talk to him during their contact. He said they talked to him, but it was "like in passing, it wasn't a....you know any negative, or have anything really to do with the situation." When asked, he said he did not conduct a formal interview with any members of the group, he was not asked by Trooper Akers to conduct any interviews, obtain any names or contact information, or to conduct any follow up investigation. He was asked if he collected any surveillance video related to the investigation and he said, "Not me personally." When asked if he knew who did collect any surveillance video, he said he thought a member of their agency, Cpl. Andy Dziobak, may have, but he was not certain. He said there was basically one person, Mr. Rynberg, who was the contact person for obtaining video from any of the businesses on Mackinac Island. When asked, he said he had not viewed any surveillance video related to Trooper Akers' investigation. It was explained to Officer Morin that during his interview with Spl/Lieutenant Croley, he told Spl/Lieutenant Croley that the next day (May 19, 2018) he was told by Trooper Akers that video surveillance from the Pink Pony Bar showed D/Sergeant Jordan rode up to the Pink Pony Bar by himself and Officer Morin acknowledged that statement to Spl/Lieutenant Croley. He was asked if he was certain it was the next day (May 19, 2018) that he was told that by Trooper Akers. Officer Morin said, "I'm not 100% certain it was the next day, it might have just been the next time I talked to Akers." He said he did not remember exactly when that was. Officer Morin was asked if he ever heard D/F/Lieutenant Longuski and/or D/Sergeant Jordan

| PAGE 26 of 41 | INVESTIGATED BY SPL/LT. RICK SEKELY | REPORTED BY SPL/LT. RICK SEKELY | REVIEWED BY JAN |
|---|---|---|---|

| Internal Affairs ORIGINAL INCIDENT REPORT | ORIGINAL DATE WED, July 11, 2018 | INCIDENT NO. IA-133-18 |
|---|---|---|
| | TIME RECEIVED | FILE CLASS 99009 |

deny that the bike was stolen, or that they knew the bike was stolen. He said he could not say for certain if D/Sergeant Jordan denied the bike was stolen, but he was certain that D/F/Lieutenant Longuski denied knowledge about the bike's status. He was asked if he heard D/Sergeant Jordan tell Trooper Akers that D/F/Lieutenant Longuski did not know anything about the bike and he said he did not hear D/Sergeant Jordan make that comment. He was asked if he was aware if The Inn at Mackinaw, the hotel where the bike was stolen from, had surveillance cameras and he said they did, but he was not certain what areas of the business were covered by the cameras. He did not know if anyone attempted to obtain video from those cameras in relation to the larceny investigation. He said most of the businesses on Mackinac Island did have surveillance cameras.

INTERVIEW WITNESS–OFC. CORY KAMINEN-MIPD:
Officer Kaminen was interviewed via telephone on July 25, 2018, at approximately 12:56 p.m. The interview was digitally recorded and a copy of the audio file has been attached as an external document. The interview is summarized below

Officer Kaminen was asked how Trooper Akers made contact with D/F/Lieutenant Longuski and D/Sergeant Jordan at Horn's Gaslight Bar and Restaurant, after it was determined that the bike they had been riding was stolen. Officer Kaminen said Trooper Akers went into the bar and had them come outside. Officer Kaminen said he stayed outside on the sidewalk. When asked, he did not know if the group that D/F/Lieutenant Longuski and D/Sergeant Jordan were with was visible through the window. Officer Kaminen was asked if Trooper Akers banged on the window and pointed to anybody inside to get them to come outside and Officer Kaminen said, "I didn't see that." Officer Kaminen was asked if he recalled what Trooper Akers said to D/F/Lieutenant Longuski and D/Sergeant Jordan, once they were outside. He was not certain on the exact words used, but he believed Trooper Akers told them they were on a stolen bike and D/F/Lieutenant Longuski said that he did not steal "dick." When asked, Officer Kaminen said he did not see Trooper Akers point his finger at either D/F/Lieutenant Longuski or D/Sergeant Jordan, but said it was possible that he did. Officer Kaminen said he mostly interacted with D/Sergeant Jordan. When Officer Kaminen was asked if he felt Trooper Akers' contact with D/F/Lieutenant Longuski and D/Sergeant Jordan was unprofessional, he said he did not believe it was. He said D/F/Lieutenant Longuski and D/Sergeant Jordan "copped the attitude right off the bat." He said they moved from in front of the bar and headed toward the MIPD, and, "They kept on yapping their mouths, swearing up and down the street, we had to try to do what we had to do to try to maintain peace." Officer Kaminen was asked if, during his interaction with D/Sergeant Jordan, D/Sergeant Jordan told him that D/F/Lieutenant Longuski did not have anything to do with the bike. Officer Kaminen said, "Ahh….be, well….I think…I think, well pretty…yeah, well pretty much, but, cuz I think he was the one who had taken the bike, but they were both on it." He then said that both of them "denied everything." When Officer Kaminen was asked if he heard D/Sergeant Jordan tell Trooper Akers that D/F/Lieutenant Longuski did not have anything to do with the bike, he said, "I, you know, unless I look back at my report and everything like that I can't recall all the details of that, um it is possible that he may have mentioned it, but I can't really say for sure." When asked, Officer Kaminen said he did not conduct any follow up investigation after they broke contact with D/F/Lieutenant Longuski and D/Sergeant Jordan and he was not asked to do any follow up by Trooper Akers. He did not collect any surveillance video and was not asked to, but said he heard that one of the videos showed D/Sergeant Jordan ride up to the Pink Pony Bar, by himself, on the bike. He had not seen any of the video himself and when asked, Officer Kaminen said he did not know who collected the video, but believed it was the "troopers." When asked when he was told about the video that showed

| PAGE 27 of 41 | INVESTIGATED BY SPL/LT. RICK SEKELY | REPORTED BY SPL/LT. RICK SEKELY | REVIEWED BY JAN |
|---|---|---|---|

| Internal Affairs<br>ORIGINAL INCIDENT<br>REPORT | ORIGINAL DATE<br>WED, July 11, 2018 | INCIDENT NO.<br>IA-133-18 |
|---|---|---|
| | TIME RECEIVED | FILE CLASS<br>99009 |

D/Sergeant Jordan rode up to the Pink Pony Bar on the bike, he said he was not certain, but believed it was the next day (May 19, 2018). Officer Kaminen was not certain if The Inn on Mackinac, or any businesses around there had video surveillance cameras and he did not know if any officers checked for video in those locations.

## INTERVIEW WITNESS–MS. MISTY DENOON–WIFE OF D/SGT. MICHAEL DENOON:
Ms. DeNoon was interviewed via telephone on July 25, 2018, at approximately 2:35 p.m. The interview was digitally recorded and a copy of the audio file has been attached as an external document. The interview is summarized below.

Ms. DeNoon confirmed that she accompanied her husband, D/Sergeant DeNoon, to Mackinac Island on May 18, 2018. She was asked what group of people she went with when they left their hotel and traveled to the Pink Pony Bar. She said it was her, her husband, "Gary from Kalamazoo," and "two other gentlemen." She thought it was just the five of them. She said it was the first time she had met any of the other people. When I explained to her the names of MSP members that were involved as being Andy Longuski and Derrick Jordan, she recalled "Andy" being with them when they traveled to the Pink Pony Bar, but said "Derrick" was not with them at that point. She said "Derrick" showed up at the Pink Pony Bar a while later with two or three other people. She said shortly after "Derrick" and the people he was with arrived, they all talked and decided to go to the bar down the street. She said they left as a group and went to Horn's Gaslight Bar and Restaurant. She said the group started walking toward Horn's Gaslight Bar and Restaurant when they noticed that "Derrick" had gotten on a bike and within seconds, the "Island police" were contacting him. She was asked how she became aware, once they were at Horn's Gaslight Bar and Restaurant, that law enforcement was involved. She said their group had a table next to a front window of the bar, and she heard a banging on the window and turned around and saw it was police officers with one of the officers saying, "Get out here." She said some of the people in their group went outside, but she remained inside. She said she did not hear any conversation between the officers and D/Sergeant Longuski and D/Sergeant Jordan. She did not witness the officers' behavior and said there were other citizens standing on the sidewalk outside the bar and she lost track of the members of her group who were outside. She thought they went down the street.

## INTERVIEW WITNESS–D/SGT. DERRICK JORDAN–MSP:
D/Sergeant Jordan was interviewed at the MSP Flint Post on July 25, 2018, at approximately 4:13 p.m. D/Sergeant Jordan was a witness in this internal investigation and he was reminded of such. Due to the fact that this internal investigation stemmed from another internal investigation (IA-095-18) where D/Sergeant Jordan was the principal, had been arrested, and was still in the process of adjudication of the criminal proceedings, I read D/Sergeant Jordan Official Order No. 1, Sections 4.35 and 4.35a. D/Sergeant Jordan advised he understood what I had just read to him and had no questions. I ordered D/Sergeant Jordan to answer my questions fully and truthfully. D/Sergeant Jordan was informed that his failure to answer my questions fully and truthfully constituted an act of insubordination for which discipline would result, up to and including discharge. The interview was digitally recorded and a copy of the audio file has been attached as an external document. The interview is summarized below.

| PAGE<br>28 of 41 | INVESTIGATED BY<br>SPL/LT. RICK SEKELY | REPORTED BY<br>SPL/LT. RICK SEKELY | REVIEWED BY<br>JAN |
|---|---|---|---|

**Internal Affairs**
**ORIGINAL INCIDENT**
**REPORT**

| ORIGINAL DATE | | INCIDENT NO. |
|---|---|---|
| WED, July 11, 2018 | | IA-133-18 |
| TIME RECEIVED | | FILE CLASS |
| | | 99009 |

| PAGE | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
|---|---|---|---|
| 29 of 41 | SPL/LT. RICK SEKELY | SPL/LT. RICK SEKELY | JAN |

Internal Affairs
ORIGINAL INCIDENT
REPORT

| ORIGINAL DATE | INCIDENT NO. |
|---|---|
| WED, July 11, 2018 | IA-133-18 |
| TIME RECEIVED | FILE CLASS |
| | 99009 |

**INTERVIEW WITNESS–SPL/SGT. CARISSA HORAN–MSP–WIFE OF D/SGT. NATHAN HORAN:**
Spl/Sergeant Horan was interviewed at via telephone on July 26, 2018, at approximately 3:47 p.m.  The
interview was brief and was not recorded.  The interview is summarized below.

Spl/Sergeant Horan confirmed that she accompanied her husband, D/Sergeant Horan, to Mackinac Island on
May 18, 2018.  She was generally familiar with the investigation that led to the arrest of D/F/Lieutenant
Longuski and D/Sergeant Jordan, but she had not reviewed any video or police reports.  She said she and
D/Sergeant Horan did not attend the dinner at the hotel, they went to dinner by themselves.  She said after
dinner they returned to the hotel, went to the hospitality room, and then herself, her husband, Detective
Babycz from Washtenaw County, and D/Sergeant Jordan walked from the hotel to the Pink Pony Bar.  She

| PAGE | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
|---|---|---|---|
| 30 of 41 | SPL/LT. RICK SEKELY | SPL/LT. RICK SEKELY | JAN |

| Internal Affairs ORIGINAL INCIDENT REPORT | ORIGINAL DATE WED, July 11, 2018 | | INCIDENT NO. IA-133-18 |
|---|---|---|---|
| | TIME RECEIVED | | FILE CLASS 99009 |

said D/Sergeant Heliin may have also been with them, but she was not certain. She said when they started out walking to the Pink Pony Bar, D/Sergeant Jordan was walking with them and at some point, he rode by them on a bike. She was not certain at what point D/Sergeant Jordan split off from them, where the bike came from, or at what point during their walk he showed up with the bike. She did not know what time they arrived at the Pink Pony Bar. Once at the Pink Pony Bar, they met up with D/F/Lieutenant Longuski and the group he was with. She said they were not there very long. She believed she used the restroom and then both groups left and headed to another bar. She said she was not paying attention and did not witness D/Sergeant Jordan and D/F/Lieutenant Longuski on the bike, or getting stopped by the police. When they were at Hom's Gaslight Bar and Restaurant, she was dancing and looked over and the table they were all occupying was empty. She said she went over, looked out the window and saw the police, but she was not sure what department they were from. She remained inside the bar and had no interaction with law enforcement at all. She did not see the initial contact by the police at Hom's Gaslight Bar and Restaurant and did not see hand posturing or finger pointing on the part of the police. She said shortly after members of their group returned to the bar, she and her husband walked back to their hotel.

## ATTEMPT TO CONTACT WITNESS–DET. MICHAEL BABYCZ:
After contact with Spl/Sergeant Horan, an email was sent to Lt. Chad Teets with the Washtenaw County Sheriff's Office Detective Bureau inquiring if a "Mike Babich" worked for them. Lieutenant Teets responded that a "Mike Babycz" was a detective with their agency and he provided the cell phone number for him of _____. Lieutenant Teets also carbon copied Detective Babycz with my original email and his response. On August 6, 2018, at approximately 10:53 a.m., I called the cell phone number given for Detective Babycz, _____. The call went straight to an automated voice messaging system. A voicemail message was left that asked him for return contact. As of August 13, 2018, I had not heard from Detective Babycz. On August 13, 2018, at approximately 3:44 p.m., I called the number again. The phone rang and then an automated voice message indicated that the voice mailbox was full. I was unable to leave a message. On August 13, 2018, at approximately 3:51 p.m., an email was sent to Detective Babycz that asked him to contact me. I received an automatic reply that indicated Detective Babycz would be out of the office and unavailable until August 20, 2018.

## INCIDENT LOG SUMMARY FOR EAICS INCIDENT REPORT 83-600-18:
On July 27, 2018, at my request, Trooper Akers was able to add me as an authorized user for the complaint and I was able to access the report, including the incident log. The eAICS incident log indicated the original incident was pulled on May 19, 2018, at 5:49 p.m. The original incident was reviewed by D/Sergeant Demers on May 21, 2018, at 9 a.m. It was unreviewed by D/F/Lt. Robert Pernaski on May 21, 2018, at 9:40 a.m. to change the complaint to protected status, resubmitted by Trooper Akers on May 21, 2018, at 12:04 p.m., and reviewed by D/Sergeant Demers on May 21, 2018, at 3:21 p.m. Supplemental Incident Report No. 001, was pulled on May 23, 2018, at 2:52 p.m. by D/Sergeant Demers and reviewed by him on May 24, 2018, at 9:48 a.m. A copy of the incident log was attached as an external document.

## NOTICE OF ADMINISTRATIVE INTERVIEW:
Trooper Akers was served with his Notice of Administrative Interview by Sgt. Dan Rambo on July 28, 2018, at 6:58 p.m.

| PAGE 31 of 41 | INVESTIGATED BY SPL/LT. RICK SEKELY | REPORTED BY SPL/LT. RICK SEKELY | REVIEWED BY JAN |
|---|---|---|---|

| Internal Affairs ORIGINAL INCIDENT REPORT | ORIGINAL DATE | INCIDENT NO. |
|---|---|---|
| | WED, July 11, 2018 | IA-133-18 |
| | TIME RECEIVED | FILE CLASS |
| | | 99009 |

**INTERVIEW PRINCIPAL--TPR. RYAN AKERS:**

Trooper Akers was interviewed on Monday, August 6, 2018, at approximately 3:44 p.m. at the St. Ignace Post. Tpr. Justin Vroman was present as Trooper Akers Michigan State Police Troopers Association (MSPTA) representative. I read Trooper Akers the allegations directly from the Notice of Administrative Interview. I also read Trooper Akers Official Order No. 1, Sections 4.35 and 4.35a. Trooper Akers advised he understood what I had just read to him and had no questions. I ordered Trooper Akers to answer my questions fully and truthfully. Trooper Akers was informed that his failure to answer my questions fully and truthfully constituted an act of insubordination for which discipline would result, up to and including discharge. The interview was digitally recorded and a copy of the audio file has been attached as an external document. The interview is summarized below.

| PAGE 32 of 41 | INVESTIGATED BY SPL/LT. RICK SEKELY | REPORTED BY SPL/LT. RICK SEKELY | REVIEWED BY JAN |
|---|---|---|---|

Internal Affairs
ORIGINAL INCIDENT
REPORT

| ORIGINAL DATE | INCIDENT NO. |
|---|---|
| WED, July 11, 2018 | IA-133-18 |
| TIME RECEIVED | FILE CLASS |
| | 99009 |

| PAGE | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
|---|---|---|---|
| 33 of 41 | SPL/LT. RICK SEKELY | SPL/LT. RICK SEKELY | JAN |

**Internal Affairs**
**ORIGINAL INCIDENT**
**REPORT**

| ORIGINAL DATE | INCIDENT NO. |
|---|---|
| WED, July 11, 2018 | IA-133-18 |
| TIME RECEIVED | FILE CLASS |
| | 99009 |

| PAGE | INVESTIGATED BY | | REPORTED BY | REVIEWED BY |
|---|---|---|---|---|
| 34 of 41 | SPL/LT. RICK SEKELY | | SPL/LT. RICK SEKELY | JAN |

**Internal Affairs**
**ORIGINAL INCIDENT**
**REPORT**

| ORIGINAL DATE | INCIDENT NO. |
|---|---|
| WED, July 11, 2018 | IA-133-18 |
| TIME RECEIVED | FILE CLASS |
| | 99009 |

| PAGE | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
|---|---|---|---|
| 35 of 41 | SPL/LT. RICK SEKELY | SPL/LT. RICK SEKELY | IAN |

**Internal Affairs**
**ORIGINAL INCIDENT**
**REPORT**

| ORIGINAL DATE | INCIDENT NO. |
|---|---|
| WED, July 11, 2018 | IA-133-18 |
| TIME RECEIVED | FILE CLASS |
| | 99009 |

| PAGE | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
|---|---|---|---|
| 36 of 41 | SPL/LT. RICK SEKELY | SPL/LT. RICK SEKELY | JAN |

**Internal Affairs**
**ORIGINAL INCIDENT**
**REPORT**

| ORIGINAL DATE | INCIDENT NO. |
|---|---|
| WED, July 11, 2018 | IA-133-18 |
| TIME RECEIVED | FILE CLASS |
| | 99009 |

| PAGE | INVESTIGATED BY | | REPORTED BY | | REVIEWED BY |
|---|---|---|---|---|---|
| 37 of 41 | SPL/LT. RICK SEKELY | | SPL/LT. RICK SEKELY | | JAN |

**Internal Affairs**
**ORIGINAL INCIDENT**
**REPORT**

| ORIGINAL DATE | INCIDENT NO. |
|---|---|
| WED, July 11, 2018 | IA-133-18 |
| TIME RECEIVED | FILE CLASS |
| | 99009 |

| PAGE | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
|---|---|---|---|
| 38 of 41 | SPL/LT. RICK SEKELY | SPL/LT. RICK SEKELY | JAN |

Internal Affairs
ORIGINAL INCIDENT
REPORT

| ORIGINAL DATE | INCIDENT NO. |
|---|---|
| WED, July 11, 2018 | IA-133-18 |
| TIME RECEIVED | FILE CLASS |
| | 99009 |

The interview concluded at approximately 5:58 p.m.

**EMAILS OBTAINED FROM TROOPER AKERS:**
During the interview with Trooper Akers, ' He was asked to provide a copy of the emails if he still had them. He provided the following emails.

An email dated May 19, 2018, at approximately 3:35 a.m. from Trooper Akers to D/Sergeant Demers that was essentially a summary of what took place and appeared to be mostly similar to what was in the narrative portion of Trooper Akers original report.

| PAGE | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
|---|---|---|---|
| 39 of 41 | SPL/LT. RICK SEKELY | SPL/LT. RICK SEKELY | JAN |

| Internal Affairs ORIGINAL INCIDENT REPORT | ORIGINAL DATE WED, July 11, 2018 | | INCIDENT NO. IA-133-18 |
|---|---|---|---|
| | TIME RECEIVED | | FILE CLASS 99009 |

An email dated May 20, 2018, from Trooper Akers to D/Sergeant Demers indicating that the original report was completed.

An email chain between D/Sergeant Demers, Sgt. Mark Giannunzio, and Trooper Akers dated between May 24, 2018, and May 25, 2018. The email from D/Sergeant Demers indicated that he had completed Supplemental Incident Report No. 001 with the arrest of D/F/Lieutenant Longuski and D/Sergeant Jordan and had taken care of the property. It also stated, "I don't imagine that you will have much more to do with this case from this point forward."

The emails were attached as an external document.

INTERVIEW WITNESS–DET. MIKE BABYCZ–WASHTENAW COUNTY S.O.:
Detective Babycz returned my phone call and was interviewed via telephone on August 14, 2018, at approximately 12:18 p.m. The interview was digitally recorded and a copy of the audio file was attached as an external document. The interview is summarized below.

Detective Babycz confirmed that he was present on Mackinac Island on May 18, 2018, to attend a polygraph conference. He confirmed that he was with D/Sergeant Jordan and D/F/Lieutenant Longuski and a group of other people at the Pink Pony Bar and subsequently, Horn's Gaslight Bar and Restaurant. He said he did attend the dinner at their hotel on May 18, 2018. When asked, he said after dinner he walked to the Pink Pony Bar with a group of other people. He said D/Sergeant Jordan, D/F/Lieutenant Longuski, "Nate" whose last name he could not recall, "Nate's" wife, and a couple of other people who he assumed were polygraph examiners, but he was not certain, were present. When asked who, specifically, he walked with, he said he did not know and estimated there was a group of six to eight people in their group. He said they walked in a group and D/Sergeant Jordan and D/F/Lieutenant Longuski were walking behind him. He said approximately 50 yards before they got to the Pink Pony Bar, D/Sergeant Jordan rode past them on a bicycle. He said it was the first time he saw the bicycle and he did not know where the bike came from, or where D/Sergeant Jordan obtained the bike from. He recalled that two police officers stopped D/Sergeant Jordan and D/F/Lieutenant Longuski on the bike in front of the Pink Pony Bar and told them they could not ride two people on the bike. He said the bike was parked using the kickstand and they went inside the Pink Pony Bar. Detective Babycz said when they came out of the Pink Pony Bar, either D/Sergeant Jordan or D/F/Lieutenant Longuski, or both got on the bike and rode it to Horn's Gaslight Bar and Restaurant. Detective Babycz said their group went into Horn's Gaslight Bar and Restaurant and got a table next to the picture window located in the front of the bar. He said approximately 30 minutes later, the police officers knocked on the window and gestured to D/Sergeant Jordan and D/F/Lieutenant Longuski to go outside. Detective Babycz said he remained inside the bar. He said he could not hear what was being said because he was inside, but it appeared to him, from his observations of their body language and gestures, that it was a tense interaction between D/Sergeant Jordan and D/F/Lieutenant Longuski and the police officers. Detective Babycz said it appeared to him that the situation was "escalating pretty quickly" and the cops looked like they were "getting pissed off." When asked who was doing the finger pointing, he said the police officers were doing it, but he could not say for certain whether or not D/Sergeant Jordan and D/F/Lieutenant Longuski were doing it. Detective Babycz said D/Sergeant Jordan, D/F/Lieutenant Longuski, and the police officers then moved from in front of the bar and out of his sight and he remained inside the bar and did not go outside. He said after about a half an hour, when D/Sergeant Jordan and D/F/Lieutenant Longuski had not returned, he and some of the other group members started to become

| PAGE 40 of 41 | INVESTIGATED BY SPL/LT. RICK SEKELY | REPORTED BY SPL/LT. RICK SEKELY | REVIEWED BY JAN |
|---|---|---|---|

| Internal Affairs ORIGINAL INCIDENT REPORT | ORIGINAL DATE WED, July 11, 2018 | | INCIDENT NO. IA-133-18 |
|---|---|---|---|
| | TIME RECEIVED | | FILE CLASS 99009 |

concerned and he walked outside and went to where they were at, by the MIPD.  Detective Babycz said when he got to the MIPD, he could hear loud voices and see some finger pointing.  He said he did not get close enough to hear exactly what was being said, but it appeared to him to have turned into kind of a "yelling match."  He could not say who had said what.  He recalled that two civilians (presumably the bike owners) showed up and took the bike from the MIPD.

## EXTERNAL DOCUMENTS:
- Notice of Administrative Interview
- eAICS Original Incident Report 83-600-18
- External Documents for 83-600-18
- External Documents from D-Sgt Demers
- eAICS Incident Log for 83-600-18
- eAICS Supp Report 1 83-600-18
- Highlighted report from Longuski
- Written statement from Longuski
- Akers Officer Daily 5-18-18
- Akers Officer Daily 5-19-18
- Akers Officer Daily 5-21-18
- Akers Officer Daily 5-24-18
- Interview Akers
- Interview Babycz
- Interview D-Sgt DeNoon
- Interview Gaudard
- Interview Jordan
- Interview Kaminen
- Interview Longuski
- Interview Misty DeNoon
- Interview Morin
- Interview N Horan
- Emails exchanged Demers-Sekely
- Mackinac Island PD Report 18-000034
- Emails exchanged Akers-Demers-Giannunzio-Sailer
- Surveillance Cam 1, Surveillance Cam Pony Front, Surveillance Lobby Sidewalk, and Surveillance Sidewalk (1 DVD)
- Video 1 and Video 2 (1 DVD)
- Blue Team Administrative Complaint Report

## STATUS:
Closed

| PAGE 41 of 41 | INVESTIGATED BY SPL/LT. RICK SEKELY | | REPORTED BY SPL/LT. RICK SEKELY | REVIEWED BY IAN |
|---|---|---|---|---|

| MICHIGAN DEPARTMENT OF STATE POLICE | ORIGINAL DATE:<br>Sat, May 19, 2018 | | INCIDENT NO:<br>083-0000600-18 |
|---|---|---|---|
| ORIGINAL INCIDENT REPORT | TIME RECEIVED:<br>1749 | | FILE CLASS:<br>23007 |
| | WORK UNIT:<br>MSP ST IGNACE POST | | COUNTY:<br>MACKINAC |
| COMPLAINANT:<br>PATROL | | | TELEPHONE NO: |
| ADDRESS: STREET AND NO:<br>430 N I75 EXPY | CITY:<br>SAINT IGNACE | | STATE:<br>MI · ZIP CODE:<br>49781 |
| INCIDENT STATUS:<br>OPEN | | | |

## LARCENY OF BICYCLE/DISORDERLY CONDUCT

**SUMMARY:**

I stopped a bicycle for a civil infraction and safety concerns. An investigation showed the bicycle belonged to Simona Rankova, an employee at The Inn on Mackinac, and had been stolen by D/Sgt. Derrick Jordan and D/F/Lt. Andrew Longuski from the Michigan State Police. During this encounter both suspects gave signs of being intoxicated. After discussion with D/Sgt Gary Demers (acting St Ignace Post Commander), I am submitting this report to the Mackinac County Prosecutor and requesting reviewing for charges of larceny and disorderly conduct.

Of note, Ofc Kaminen also wrote a report about his involvement with this incident; the number is 18-34.

**VENUE:**

MACKINAC COUNTY, 6896 MAIN ST, MACKINAC ISLAND, MI,       AT OR NEAR: INN ON MACKINAC

**DATE & TIME:**

ON OR AFTER: FRI, MAY 18, 2018 AT 2330

**COMPLAINANT:**

Patrol: Trooper Ryan Akers (primary/investigating), Ofc Cory Kaminen and Ofc Kurtis Morin (assisting)

**INITIAL OBSERVATION/TRAFFIC STOP:**

While observing traffic on Main St, I observed two men exit the Pink Pony. These men were later identified as D/Sgt. Jordan and D/F/Lt. Longuski, although I didn't recognize them at the time. D/Sgt Jordan got on a bike that was parked at the curb, and D/F/Lt. Longuski got on behind him. They then rode down the street toward Horn's Bar. The bike only had one seat, so they were violating MCL 257.658.

I rode down after them and caught up to them as they approached Horns. I said, "Guys, you can't ride double. That's actually Michigan law." Both jumped off, letting the bike fall to the road (it fell on its left side). They

| PAGE:<br>1 of 6 | INVESTIGATED BY:<br>AKERS, RYAN, 1618, TROOPER | INVESTIGATED BY: | REVIEWED BY: |
|---|---|---|---|

PRINTED: 5/20/2018 00:11

| MICHIGAN DEPARTMENT OF STATE POLICE | ORIGINAL DATE:<br>Sat, May 19, 2018 | INCIDENT NO:<br>083-0000600-18 |
|---|---|---|
| ORIGINAL INCIDENT REPORT | TIME RECEIVED:<br>1749 | FILE CLASS:<br>23007 |

apologized, saying they didn't realize it was the law. D/F/Lt. Longuski asked me, "What post are you from?" I told him Rockford Post, and made a joking comment about the bike, which was purple with a pink seat. Some of the group they had been with at the Pink Pony walked up and were laughing at them. It was readily apparent that both D/Sgt Jordan and D/F/Lt. Longuski were intoxicated. The bike was still laying in the roadway, so I asked them to park it at the curb, which one of them did. They both then went into Horns Bar, and I rode away.

Ofc Kurtis Morin was further behind me during this interaction and spoke with some of the rest of the group, who laughingly told him the two men I stopped were troopers.

**INVESTIGATION/DETERMINE BICYCLE WAS STOLEN:**

Ofc Cory Kaminen witnessed the incident from a short distance away and became suspicious when he saw a Mackinac Island bicycle registration on the bike in question (2018-2620). He went back to the police department and ran the registration, learning it belonged to Simona Rankova, an employee of The Inn on Mackinac. He contacted me via cell phone and said he suspected the bike had been stolen because the two individuals on the bike appeared to him to be tourists and the bicycle belonged to a summer employee.

I asked Ofc Morin to keep an eye on the bicycle. I then went down and found Ms Rankova in room C2 of Bennett Housing on Main St. She said she had just left work (she is a concierge at The Inn on Mackinac) about 15 minutes prior to my conversation with her and when she came out, her bicycle was missing. Her bicycle had been left parked at the curb on Main St outside the hotel. She confirmed she had not loaned it to anyone or given anyone permission to use it.

Also, note that I spoke with Ms. Rankova again on 5-19-18 (after the incident). She confirmed she had purchased the bicycle for $50 back in 2015 during her first season working on the island. She also pointed out the left pedal was broken, which it had not been when she last saw it. Ms. Rankova said it wouldn't cost anything to fix it as the hotel had a maintenance shop and they would take care of it.

Based on the timeline given to me , Ms. Rankova had noticed her bicycle missing about 5 minutes before I saw D/Sgt Jordan and D/F/Lt Longuski riding it. However, she had been on a several hour shift at the front desk. It's hard to say when it was taken from the Inn on Mackinac during that time, and she didn't actually see anyone ride away on it.

**VICTIM:**

NAM:  SIMONA RANKOVA
BIR:                                                    RAC:                  ETH:
NBR:                                                  SEX:                  DL:            /
STR:                                                   DOB:  11/12/1992  SSN:
SFX:                                                   HGT:                  SI:            /
CTY:                                                   WGT:                  FBI:
TXH:                                                   HAI:                  MNU:
TXW:                                                  EYE:                  PR:
EMPLOYER: INN ON MACKINAC

| PAGE: | INVESTIGATED BY: | INVESTIGATED BY: | REVIEWED BY: |
|---|---|---|---|
| 2 of 6 | AKERS, RYAN, 1618, TROOPER | | |

PRINTED: 5/20/2018 00:11

| MICHIGAN DEPARTMENT OF STATE POLICE | ORIGINAL DATE:<br>Sat, May 19, 2018 | | INCIDENT NO:<br>083-0000600-18 |
|---|---|---|---|
| ORIGINAL INCIDENT REPORT | TIME RECEIVED:<br>1749 | | FILE CLASS:<br>23007 |

**RECONTACT SUSPECTS:**

I then met with Ofc Morin and Ofc Kaminen outside Horns and we discussed what to do. Ofc Morin said he believed the two suspects might be troopers or at least police officers based on what others in their group had said. We agreed that we would go into Horns and have them come outside the bar. If they were decent with us about it, Ofc Kaminen would write the city local ordinance "UDAB" civil infraction (unlawful driving away of a bicycle) and I would write them a state civil infraction for riding double on a bicycle (MCL 257.658). They would also have to agree to return the bike and return to their hotels for the night. If they refused to cooperate, we would charge them both with misdemeanor larceny less than $200.

We went to the door of Horns and both men were actually very near the door, so we motioned them out. I asked them both, "Are you cops?" They both answered, "Yes." I pointed to the bicycle and asked, "Then why are you stealing someone else's bicycle?" They both reacted and denied stealing a bicycle. We all three (Ofc Kaminen, Ofc Morin, and I) responded, "You were just riding double on that bike, and it belongs to an Island summer employee who did not give you permission to use it." I added, "If you are police officers, the bar is set much higher." Both D/Sgt Jordan and D/F/Lt Longuski dropped several curse words in this conversation—I specifically remember D/F/Lt Longuski saying, "I didn't steal dick." At this point we were on Main St outside Horns so I told everyone to come up to the police department with me to get away from the crowd.

On the way up they both told me who they were, and that they were here with the Polygraph Convention at Mission Point. Some of the group they were with followed us. D/F/Lt Longuski and D/Sgt Jordan demanded that I give them the courtesy of being police officers and told me I was blowing everything out of proportion. There was also the suggestion that I would hear about this later.

(Of note, Ofc Morin activated his body camera (body cam #4) once we got to the police department so some or all of this conversation should have been captured. This footage will be added to property once I obtain it.)

When we got to the police department, I explained to both of them I was pretty disappointed to see a Michigan State Police sergeant and lieutenant acting like irresponsible, entitled drunks. I pointed out the bike they took belonged to a foreign worker from Eastern Europe here on a visa. I told them if we had not recovered it she probably would have had to wait another paycheck or two before she could afford to replace it. Both D/Sgt Jordan and D/F/Lt Longuski asked me why they would steal a bike that they "wouldn't even buy"?

D/F/Lt Longuski was very confrontational and said, "If you are going to book me for possessing a stolen bike, let's go. Otherwise I'm going back to the bar." The group he was with started saying, "Andy, calm down." I asked him if he understood where I was coming from, that they were troopers acting in a way troopers are not expected to act, and that the bike he was on was not his. D/F/Lt Longuski said he understood, but said he had no knowledge of whose bike it was and was just riding with his friend, referring to D/Sgt Jordan. He said I needed to be careful and that I was disrespectful the way I called them out like I did. He asked if he was free to go, and I said he was. He then left with part of the group and walked back toward Horns.

D/Sgt Jordan was considerably calmer and I tried to find out where he got the bike from, since he had been the one in front and pedaling. He said, "My friend told me I could take this bike." I tried to ask him who that friend was but he distinctly avoided the question. I asked him if he rode this bike from Mission Point (where everyone was staying for the convention) and he said he didn't. He insisted a friend allowed him to ride the bike from the Pink Pony but wouldn't identify this friend. He then lectured me for a while about respecting other officers and giving them the "thin blue line" courtesy. He said since they were troopers I should expect they were doing the

| PAGE:<br>3 of 6 | INVESTIGATED BY:<br>AKERS, RYAN, 1618, TROOPER | INVESTIGATED BY: | REVIEWED BY: |
|---|---|---|---|

PRINTED: 5/20/2018 00:11

| MICHIGAN DEPARTMENT OF STATE POLICE | ORIGINAL DATE:<br>Sat, May 19, 2018 | | INCIDENT NO:<br>083-0000600-18 |
|---|---|---|---|
| ORIGINAL INCIDENT REPORT | TIME RECEIVED:<br>1749 | | FILE CLASS:<br>23007 |

right thing and not be a "hard-ass." He said, "You won't work on Mackinac Island your whole career. If you try that attitude in an urban area it won't work." I merely insisted troopers are expected to act better than this. He said he would be willing to return the bike and apologize to the owner.

I finally said to Sgt Jordan, "Why we don't we return this bike then?" meaning I was taking him up on his offer to go back and apologize. He said, "Ok, let's go." He then walked off with the rest of his group and left me with the bike, apparently not meaning what he said about going and apologizing.

Ofc Morin made small talk with the rest of the group. One particular person (who refused to give his name or department) was very apologetic to Ofc Morin and called D/F/Lt Longuski and D/Sgt Jordan "dumb" and "idiots." Ofc Morin said he did ask if any of them knew where the bike came from, and was told D/Sgt Jordan had not ridden any kind of bike to the Pink Pony and they had no idea where that bike came from. I didn't get names or departments of anyone else involved. Ofc Morin said he got the impression that only one person another department and the rest were MSP, but he didn't get names either.

The reason I did not proceed immediately with enforcement action as I had originally intended was the identity of the suspects had been established, I could easily re-contact them if needed, and I did not want the situation to escalate further due to their increasing level of intoxication.

## SUSPECTS:

| NAM: | ANDREW PAUL LONGUSKI | | | |
|---|---|---|---|---|
| BIR: | | RAC: | White | ETH: |
| NBR: | 444 | DIR: E | SEX: MALE | DL: |
| STR: | BANNERSTONE | | DOB: 09/20/1967 | SSN: |
| SFX: | Court | | HGT: 5'10" | SI: MI/5092731K |
| CTY: | MIDLAND | ST: MI | WGT: 190 | FBI: |
| TXH: | | ZIP: 48640 | HAI: Gray | MNU: |
| TXW: | | | EYE: Blue | PR: |
| EMPLOYER: MICHIGAN STATE POLICE | | | | |

| NAM: | DERRICK LAMAR JORDAN | | | |
|---|---|---|---|---|
| BIR: | | RAC: | Black | ETH: |
| NBR: | 37225 | DIR: | SEX: MALE | DL: |
| STR: | THINBARK | | DOB: 10/02/1972 | SSN: |
| SFX: | Street | | HGT: 5'7" | SI: MI/4177597A |
| CTY: | WAYNE | ST: MI | WGT: 200 | FBI: |
| TXH: | | ZIP: 48184 | HAI: Black | MNU: |
| TXW: | | | EYE: Brown | PR: |
| EMPLOYER: MICHIGAN STATE POLICE | | | | |

## CONTACT ACTING POST COMMANDER:

On 5-19-18 around 0004 (immediately after the suspects returned to the bar), I notified D/Sgt Gary Demers, the acting post commander for St Ignace, of the incident. Later in the day he re-contacted me and asked that I proceed with a report and enforcement action as I had intended prior to making contact with the suspects (see first paragraph under heading "recontact suspects").

| PAGE:<br>4 of 6 | INVESTIGATED BY:<br>AKERS, RYAN, 1618, TROOPER | INVESTIGATED BY: | REVIEWED BY: |
|---|---|---|---|

PRINTED: 5/20/2018 00:11

| MICHIGAN DEPARTMENT OF STATE POLICE | ORIGINAL DATE:<br>Sat, May 19, 2018 | INCIDENT NO:<br>083-0000600-18 |
|---|---|---|
| ORIGINAL INCIDENT REPORT | TIME RECEIVED:<br>1749 | FILE CLASS:<br>23007 |

**INTERVIEW WITNESS:**

I then went down to the Pink Pony and spoke with Porscha Tarsetti. She was working the front door when D/Sgt Jordan and D/F/Lt Longuski initially exited the Pony and got on the bike. She didn't know names, but from how she described who got on the bike, I was able to figure out who said and did what. According to Porscha, D/Sgt Jordan came out with D/F/Lt Longuski at the same time. D/Sgt Jordan said he was taking his "dad" home, laughing and joking. D/Sgt Jordan started walking one way, and D/F/Lt Longuski yelled, "Hey idiot, home's this way!" D/Sgt Jordan then went and got on the purple bicycle in question, saying, "Here's my bike, come on." D/F/Lt Longuski then got on the back and they started riding away. The rest of the group came out, and Porscha specifically heard them saying, "You just stole that bike!" and "Where'd you get that bike?" She heard D/Sgt Jordan responding back that it was his bike. The group then began making jokes about a "black guy" and a "white guy" riding a stolen bike together. Porscha said she thought they were joking and she was laughing about it at the time. I specifically asked Porscha if anyone ever came out and appeared to give D/Sgt Jordan permission to use the bike, and she said no one did while she was sitting there.

**WITNESS:**

NAM:  PORSCHA RAE TARSETTI
BIR:
NBR:
STR:
SFX:



RAC:                          ETH:
SEX:                          DL:          /
DOB:   01/15/1995   SSN:
HGT:                          SI:           /

CTY:                          WGT:                          FBI:
TXH:                          HAI:                          MNU:
TXW:                          EYE:                          PR:
EMPLOYER: PINK PONY

**FURTHER OBSERVATION OF SUSPECTS:**

I didn't have any personal contact with the group after that, but I observed the whole group, including D/Sgt Jordan and D/F/Lt Longuski, leave Horns Bar at 2AM when the bar closed. The group then walked down Main St, all obviously highly intoxicated, and with frequent use of profanity which I was able to hear from a block away.

**FURTHER INFORMATION REGARDING CHARGES:**

Based on all of this, I believe someone else--an unknown person--stole the bike from The Inn on Mackinac earlier in the evening and rode it to the Pink Pony.

D/Sgt Jordan and D/F/Lt Longuski then came out of the Pink Pony and took the bicycle for their own use, stealing it a second time. The bicycle was moved and taken without the owner's permission. D/Sgt Jordan specifically said he received permission from a friend, but this appears to be a lie, as an employee of the Pink Pony who was completely sober at the time witnessed the incident. Never once did she hear permission being given from anyone to ride the bike, and in fact she heard D/Sgt Jordan being accused of stealing it. D/Sgt Jordan himself states he had not ridden on that bike prior to leaving the Pink Pony and when I saw him on it it was the first time he rode it. This would indicate D/F/Lt Longuski would have known it was not D/Sgt Jordan's

| PAGE:<br>5 of 6 | INVESTIGATED BY:<br>AKERS, RYAN, 1618, TROOPER | INVESTIGATED BY: | REVIEWED BY: |
|---|---|---|---|

PRINTED: 5/20/2018 00:11

| **MICHIGAN DEPARTMENT OF STATE POLICE** | **ORIGINAL DATE:**<br>Sat, May 19, 2018 | **INCIDENT NO:**<br>083-0000600-18 |
|---|---|---|
| **ORIGINAL INCIDENT REPORT** | **TIME RECEIVED:**<br>1749 | **FILE CLASS:**<br>23007 |

bike, and the comments made about it being stolen were all said in his hearing according to the witness. Finally, both D/Sgt Jordan and D/F/Lt Longuski did not return the bike, despite having an opportunity to do so once I informed them it was stolen. They appeared to have no intention of returning it despite my suggestion to do so. It is reasonable to think Ms. Rankova would have been permanently deprived of her bike unless I had intervened.

Finally, their disorderly conduct consisted of their frequent use of profane language, their riding a bicycle in an unsafe manner, stealing a bicycle which is directly contradictory to their profession as troopers, and their lack of concern for others' safety in leaving the bicycle in the road. All of this behavior appeared to be directly related to their obvious intoxication.

I reviewed the driving and criminal history of both suspects. I did not see any criminal history for D/Sgt Jordan. D/F/Lt Longuski's driving history shows he was arrested for operating while intoxicated in 2012, and it appears he pled to operating while impaired. His criminal history printout does not reflect this information, however, so it may have been expunged.

**DISPOSITION OF STOLEN BICYCLE:**

Immediately after speaking with the suspects, I walked the bicycle back down to The Inn on Mackinac and left it with the night manager for Ms. Rankova to pick up in the morning. The bicycle is listed in eAICS as stolen/recovered/not in possession.

**FURTHER ACTION TO BE TAKEN:**

Ofc Morin's body camera footage will saved to a disc and added to property at future date.

**PHOTOGRAPHS:**

I took photographs of the bicycle in question and they have been uploaded to DCSR.

**CRIME VICTIM'S RIGHTS:**

I provided a UD-30 and my business card to Ms. Rankova.

**STOLEN/RECOVERED/NOT IN POSSESSION:**

Prop 0001 -Type: BICYCLE Qty: 1 Article Type: Bicycle Brand: Huffy Model: MT. ECHO Serial #: GB02AO41199 Misc #: OAN: SIMONA Value: $50.00 Recovered Value: $40.00
Descrp: PURPLE WOMEN'S FRAME 18-SPEED MOUNTAIN BIKE, W/PINK SEAT AND ORANGE TAG SAYING "SIMONA"
Date/Time Recovered: 05/18/2018

**STATUS:**

OPEN, warrant request submitted to the Mackinac County Prosecutor for larceny less than $200 and disorderly conduct

| **PAGE:**<br>6 of 6 | **INVESTIGATED BY:**<br>AKERS, RYAN, 1618, TROOPER | **INVESTIGATED BY:** | **REVIEWED BY:** |
|---|---|---|---|

PRINTED: 5/20/2018 00:11

| MICHIGAN DEPARTMENT OF STATE POLICE | ORIGINAL DATE: Sat, May 19, 2018 | INCIDENT NO.: 083-0000600-18 |
|---|---|---|
| SUPPLEMENTAL INCIDENT REPORT 0001 | SUPPLEMENTARY DATE: Wed, May 23, 2018 | FILE CLASS: 23007 |

| INCIDENT STATUS: OPEN |
|---|

## LARCENY OF BICYCLE

### JOURNALS

| 5/21/18 | Demers | Initial review and DB review. Report suppressed by Eighth District HQ. At the direction of Eight District HQ, copies of the report were forwarded to the Mackinac County PA's office for his review and the possible issuance of charges. |
|---|---|---|

### WARRANT ISSUED:

On 5/22/18 the Mackinac County Prosecutor's office issued a two count misdemeanor warrant for each suspects' arrest. The charges are:

1) Larceny under $200 MCL 750.3565
2) Disturbing the Peace MCL 750.170.

Both warrants had a personal recognizance bond listed upon them.

### CONTACT EIGHTH DISTRICT COMMAND STAFF:

I contacted the Eighth District Command Staff and advised them of the issuance of the arrest warrants. I was eventually directed to contact Inspector Burnside of the BID Unit in Lansing, who would assist in the execution of the warrants.

### CONTACT INSPECTOR BURNSIDE:

Inspector Burnside was contacted and advised of the arrest warrants. He stated that he would be calling both suspects into his office tomorrow morning (5/23/18) to execute the arrest warrants.



RECEIVED
MAY 24 2018
MACKINAC COUNTY PROSECUTOR

| PAGE: 1 of 3 | INVESTIGATED BY: AKERS, RYAN, 1618, TROOPER | INVESTIGATED BY: DEMERS, GARY, 8, D/SERGEANT | REVIEWED BY: |
|---|---|---|---|

PRINTED: 5/24/2018 08:51

| MICHIGAN DEPARTMENT OF STATE POLICE | ORIGINAL DATE: Sat, May 19, 2018 | INCIDENT NO: 083-0000600-18 |
|---|---|---|
| SUPPLEMENTAL INCIDENT REPORT 0001 | SUPPLEMENTARY DATE: Wed, May 23, 2018 | FILE CLASS: 23007 |

**ARREST:**

| NAM: ANDREW PAUL LONGUSKI | RAC: White | ETH: | |
|---|---|---|---|
| BIR: | SEX: MALE | DL: | MI/L522067676729 |
| NBR: 444 DIR: E | DOB: 09/20/1967 | SSN: | |
| STR: BANNERSTONE | HGT: 5'10" | SI: | MI/5092731K |
| SFX: Court | WGT: 190 | FBI: | |
| CTY: MIDLAND ST: MI | HAI: Gray | MNU: | |
| ZIP: 48640 | EYE: Blue | PR: | |
| TXH: | | | |
| TXW: | | | |
| SMT: | | | |

CHARGE:
2399 LARCENY LESS THAN $200.00 750.356(5)
CHARGE:
5312 DISTURBING THE PEACE 750.17

**ARREST:**

| NAM: DERRICK LAMAR JORDAN | RAC: Black | ETH: | |
|---|---|---|---|
| BIR: | SEX: MALE | DL: | MI/J635139488760 |
| NBR: 37225 DIR: | DOB: 10/02/1972 | SSN: | |
| STR: THINBARK | HGT: 5'7" | SI: | MI/4177597A |
| SFX: Street | WGT: 200 | FBI: | |
| CTY: WAYNE ST: MI | HAI: Black | MNU: | |
| ZIP: 48184 | EYE: Brown | PR: | |
| TXH: | | | |
| TXW: | | | |
| SMT: | | | |

CHARGE:
2399 LARCENY LESS THAN $200.00 750.356(5)
CHARGE:
5312 DISTURBING THE PEACE 750.17

**NOTICE TO APPEAR:**

Both suspects were arrested and served with a notice to appear by Inspector Burnside on 5/23/18. They were directed to appear before the 92nd District Court of Mackinac County on 6/13/18 at 9AM. I was later advised that this date was changed to 6/6/18 at 9AM at the request of the suspects.

Inspector Burnside completed the Interim Bond Receipts (UD-078), and issued copies to the suspects. He stated that he mailed original copies to me for the post and court. They will be properly distributed once they are received.

| PAGE: 2 of 3 | INVESTIGATED BY: AKERS, RYAN, 1618, TROOPER | INVESTIGATED BY: DEMERS, GARY, 8, D/SERGEANT | REVIEWED BY: |
|---|---|---|---|

PRINTED: 5/24/2018 08:51

Incident No:          **18-000034**

**INVESTIGATION:**

R.O. was on foot patrol walking on the sidewalk south direction across the street from Horn's Bar. R.O. observed a bike travelling from the same direction with two subjects double riding the bike and parking on the street in front of Horn's Bar. One subject was a b/m who was peddling the bike with another w/m riding on the back of the bike. R.O. observed this at the same time Tpr. Akers and Ofc. Morin arrived to stop the subjects on patrol bikes. R.O. observed these two subjects a couple of minutes prior to the incident walking out of the Pink Pony Bar before riding the bike. Tpr. Akers informed both subjects it was illegal to double ride on a bike designed for one person. Both subjects dismounted the bike in front of Horn's Bar and let the bike fall to the ground without care. Tpr. Akers informed the subjects to pick up the bike. The b/m subject picked the bike up and left it parked half in the middle of the street and both subjects walked in Horn's Bar.

R.O. noticed the bike the subjects were riding was a female bike with registration stickers for Mackinac Island. R.O. suspected the two subjects had unlawfully taken the bike to use without owners permission. R.O. copied the registration on the bike and looked up the owner of the bike. The registration on the bike belonged to SIMONA RAANKA, an employee of the Inn on Mackinac Hotel. R.O. notified Tpr. Akers of this finding. Tpr. Akers immediately contacted the owner of the bike, SIMONA RAANKA, at the Inn on Mackinac Hotel. RAANKA informed Tpr. Akers that her bike had been stolen within minutes or prior to her finishing her work shift.

Tpr. Akers returned to in front of Horn's Bar and informed R.O. the bike the two subjects were riding was a stolen bike. Tpr. Akers also informed R.O. the two subjects were Michigan State Police Officers. Tpr. Akers entered Horn's Bar and contacted the two subjects about the incident. Both subjects were escorted to MIPD to discuss the incident with them. While walking up to MIPD, other off duty MSP officers followed along behind to MIPD. The two subjects were identified as MSP officers SGT. DERRICK LAMAR JORDAN and LT. ANDREW PAUL LONGUSKI. It was also observed that both subjects along with the other members of the MSP group had been drinking and appeared to be highly intoxicated. Officer Morin had activated his body cam for the discussion at MIPD involving the incident.

**VIOLATIONS:**
Both JORDAN and LONGUSKI were both released and free to leave at this time. Violations include Unlawful Driving Away of a Bicycle, Ord. 38-42 and Double Riding on a Bike Ord. 66-165 or MCL 257.658.

**STATUS:**
TOT MSP ST. IGNACE

Reported By:                          Reviewed By:                          Date Printed: 05/19/2018

Page   2  of  2

**Mackinac Island Police Department -- (906) 847-3300**

**7374 Market St. Mackinac Island, MI 49757**

Date Printed:    05/19/2018

Time Printed:    07:10 PM

### Bike Registration Receipt

**Registration Information:**

| | |
|---|---|
| Registration No: | 1802620 |
| Date Issued: | 05/10/2018 |
| Expire Date: | 04/30/2019 |
| Issued By: | EJM |
| Amount Paid: | 3.50 |

**Registered to (Owner):**

| | |
|---|---|
| Name: | RAANKA, SIMONA |
| Address: | |
| Phone: | |
| Date of Birth: | 11/12/1992 |
| DL No/State: | |

**Bicycle Information:**

| | | | |
|---|---|---|---|
| Make: | HUFFY | Speeds: | 6 Speed |
| Model: | MT. ECHO | Tires: | Medium |
| Serial Number: | GB02AO41199 | Brakes: | Hand |
| Frame Style: | Female/Girl | Fenders: | None |
| Primary Color: | Purple | Baskets: | None |
| Secondary Color: | Silver/Aluminum | | |